[No. 11277. *En Banc.* June 7, 1913.]

STATE CAPITOL COMMISSION, *Petitioner,* v. STATE BOARD OF
FINANCE *et al., Respondents.*[1]

SCHOOLS AND SCHOOL DISTRICTS—SCHOOL FUNDS — INVESTMENT—
STATE BONDS. Under Const., art. 16, § 5, and Rem. & Bal. Code,
§ 5056, authorizing the investment of the permanent school fund in
state bonds, the investment cannot be made in state capitol build-
ing bonds issued against the capitol building fund to be derived from
the sale of the capitol lands, unless the general credit of the state is
lawfully pledged to the payment of the principal and interest of
the bonds.

STATES—BONDS—VALIDITY—STATE DEBT—LIMITATION—SUBMISSION
TO VOTE. Laws 1913, p. 139, § 2, and Laws 1911, p. 323, § 5, providing
that the state shall guarantee the principal and interest of the cap-
itol building bonds to be issued against the capitol building fund,
pledges the general credit of the state therefor, and hence involves
the incurring of a state indebtedness in violation of the prohibition
of the Const., art. 8, §§ 1-3; since the bonds provided for exceed the
limitation of $400,000, specified in § 1 for certain indebtedness, and
do not fall within § 2 authorizing indebtedness to repel invasion and
defend the state in war, and were not authorized by a vote of the
people as required by § 3 in the case of all other state indebtedness.

SAME—STATE INDEBTEDNESS — ASSETS — OFFSET. Where the state
pledged its general credit for the payment of capitol building bonds
to be paid from future sales of the capitol lands, the ascertained value
of the capitol lands cannot be offset against the state obligation upon
its pledge for the purpose of showing that the state had not in fact
incurred any real indebtedness.

Application filed in the supreme court May 12, 1913, for a
writ of mandate to the state board of finance. Denied.

*Frank C. Owings,* for petitioner.

*The Attorney General* and *R. E. Campbell, Assistant,* for
respondents.

PARKER, J.—This is an original application in this court
wherein the state capitol commission seeks a writ of mandate
requiring the state board of finance to comply with its con-

[1]Reported in 132 Pac. 861.

tract entered into with the state capitol commission for the purchase, with funds of the permanent school fund of the state, bonds of the face value of $500,000 to be issued against the capitol building fund, in pursuance of ch. 59, page 319, Laws of 1911, as amended by ch. 50, page 31, Laws of 1913. The state board of finance resists the petition of the capitol commission by demurrer and motion to quash, upon the ground that the petition does not state facts constituting legal ground for the relief prayed for.

The controlling facts alleged in the petition may be briefly stated as follows: On April 29, 1913, the state capitol commission adopted a resolution providing for the immediate execution and sale of negotiable bonds against the capitol building fund, in the total sum of $4,000,000, payable in twenty years, with interest not exceeding five per cent per annum, and with right reserved in the state to pay or refund the same at the end of any five-year period during the twenty years; and also providing that its secretary advertise for and obtain bids for the purchase of such bonds, and for portions thereof less than the whole. Thereafter the state board of finance adopted a resolution that there should be invested in the proposed issue of capitol building fund bonds $500,000 of the permanent school fund of the state. This resolution was in substance and effect an offer of the state board of finance to purchase that amount of the bonds, at par, to bear interest at four per cent per annum. Thereafter the state capitol commission adopted a resolution accepting the offer of the state board of finance. Thereafter the state board of finance rescinded its resolution offering to purchase the bonds, and declined to complete the purchase thereof, upon the sole ground that it had been advised by the attorney general that such issuance of the bonds would be in violation of the limitation imposed upon the legal indebtedness of the state by art. 8 of the state constitution.

Prior to the adoption of the resolution of April 29, 1913, by the state capitol commission, providing for the issuance

of the bonds, that commission had caused the capitol lands, from the sale of which the capitol building fund is to be derived, to be appraised and the total value of those lands to be determined, as provided by ch. 59, page 319, Laws of 1911, which total value so determined is $5,265,519.47. The state board of finance is authorized by Rem. & Bal. Code, § 5056 (P. C. 485 § 163), to invest the permanent school fund of the state in national, state, county, municipal or school district bonds bearing interest at a rate of not less than three and three-fourths per centum per annum. Section 5 of art. 16 of the state constitution, as amended in November, 1894, provides:

"None of the permanent school fund of this state shall ever be loaned to private persons or corporations, but it may be invested in national, state, county, municipal, or school district bonds."

This constitutional provision has been held by this court to prohibit the investment of the permanent school fund in any securities other than those enumerated therein, to wit: "national, state, county, municipal, or school district bonds." *State ex rel. Hellar v. Young,* 21 Wash. 391, 58 Pac. 220; *State ex rel. Port Townsend v. Clausen,* 40 Wash. 95, 82 Pac. 187. In the last cited case, there was involved the question of the investment of the permanent school fund in certain bonds to be issued by the city of Port Townsend, payable only out of a special fund to be derived from the revenues of the city waterworks system. The city did not pledge its credit for such payment. In holding that these bonds were not such bonds as the permanent school fund could be lawfully invested in, the court said, at page 108:

"That municipality neither could, nor did, pledge its credit for their payment, and, as we have shown, without such pledge they cannot be 'municipal bonds' within the meaning of that term as used in the constitution."

It appears from the language of the opinion that the city could not pledge its general credit to the payment of those

bonds, because the amount thereof would exceed its constitutional debt limit.   This fact accounts for the language of the court in so far as it has reference to the power of the. city to pledge its general credit for the payment of the bonds.   Upon the principle of the holding of the court in the *Port Townsend* case, it would seem plain that the bonds here involved will not be legally issued general state bonds, unless the credit of the state is lawfully pledged to their payment. By ch. 59, Laws of 1911, as amended by ch. 50, Laws of 1913, the legislature authorized the state capitol commission to proceed with the construction of permanent capitol buildings and to obtain funds therefor by the issuance and sale of bonds against the capitol building fund to be derived from the sale of the capitol lands.   Section 2 of that act as amended, among other things, provides:

"The said capitol commission may proceed at once to issue negotiable annual interest bearing bonds in an amount not exceeding four million dollars against the capitol building fund and to sell the same  .  .  .   Such bonds shall bear a rate of interest not to exceed five per cent per annum, .  .  .   The proceeds of the bonds herein authorized to be issued shall be used:  1st, in the payment of all outstanding warrants and interest thereon against the capitol building fund;  2d, in repaying to the general fund the advancements made therefrom to the capitol building fund;  3d, for the carrying out of the other purposes mentioned in section one of this act.  .  .  .   The state of Washington hereby guarantees the payment of the principal and the interest on all bonds issued under the provisions of this act."  Laws 1913, p. 139.

Section 5 of that act, among other things, provides:

"Sec. 5.   Whenever the capitol commission shall offer any bonds for sale, and there shall be in the permanent school fund, or other permanent or investment fund, sufficient uninvested funds to cover the purchase of such issue of bonds or any part thereof, the board, officer or officers, authorized to invest any such fund may invest the same in any of said bonds: *Provided, however,*  .  .  .   *And  provided fur-*

*ther*, that any and all bonds purchased by any of the permanent funds as in this section provided, shall, for the purposes of such investment, be deemed in all respects state general bonds and shall be guaranteed both principal and interest by the general fund of the state." Laws 1911, p. *323.*

It thus becomes plainly manifest that the legislature sought to pledge the credit of the state to the payment of these bonds to the end that the permanent school fund could be lawfully invested therein, evidently having in mind the limitations upon such investment prescribed by § 16, art. 5 of the state constitution, above quoted, and the decisions of this court construing the same which we have noticed.

The problem now confronting us is, will these bonds, when issued, be such securities as the permanent school fund of the state may be lawfully invested in? This problem must, of course, find its solution in the correct answer to the question, Will these bonds, when issued and acquired by the permanent school fund as an investment, be legally *"in all respects state general bonds,"* as declared by the language of § 5 above quoted? If they cannot be lawfully issued as such, that is, if the general credit of the state cannot be lawfully pledged for their payment, it must follow that they will not be such securities as the permanent school fund may be lawfully invested in.

The debt creating power of the state has its limitations as defined by art. 8 of the state constitution, reading as follows:

"Sec. 1. The state may, to meet casual deficits or failure in revenues or for expenses not provided for, contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not at any time exceed four hundred thousand dollars ($400,000), and the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained, or to repay the debts so contracted, and to no other purpose whatever.

"Sec. 2. In addition to the above limited power to contract debts, the state may contract debts to repel invasion,

suppress insurrection, or to defend the state in war, but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, and to no other purpose whatever.

"Sec. 3.    Except the debt specified in sections one and two of this article, no debts shall hereafter be contracted by or on behalf of this state, unless such debt shall be authorized by law for some single work or object to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof.    No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election, and all moneys raised by authority of such law shall be applied only to the specific object therein stated, or to the payment of the debt thereby created, and such law shall be published in at least one newspaper in each county, if one be published therein, throughout the state, for three months next preceding the election at which it is submitted to the people."

It seems plain to us that this proposed obligation to which the general credit of the state is sought to be pledged for payment, would not belong to that class of obligations which may be incurred under § 1, even if within the $400,000 limit there prescribed; and being far beyond that limit in amount, such fact furnishes an additional obstacle to the lawful incurring of the obligation, in so far as the provisions of that section are concerned.    Of course, the incurring of the obligation is not authorized by § 2, since it is not sought to be incurred to repel invasion, suppress insurrection, or to defend the state in war; and not being authorized by a vote of the people, the proposed obligation has not the semblance of support in § 3.    It is worthy of note in this connection that, in so far as this particular proposed obligation of the state is concerned, the sections of the constitution above quoted are not merely a limitation upon the amount of debt which may be incurred, as in the constitutional provisions

relating to the debts of municipal corporations, but they constitute an absolute prohibition against the creation of any debt in any sum for this purpose, except by a vote of the people. In *State ex rel. Jones v. McGraw,* 12 Wash. 541, 41 Pac. 893, referring to § 1 of art. 8 of the constitution, the court said:

"The prohibition in the constitution is that 'such debts, . . . singly or in the aggregate, shall not at any time exceed four hundred thousand dollars,' and constitutes an 'impassable barrier' to the creation of any indebtedness in excess thereof for any period of time, however brief, or for any purpose, however worthy."

Surely the language of § 3, which is not merely a limitation upon the amount of the indebtedness which may be incurred, but is an absolute prohibition against the incurring of any debt in this manner for this purpose, is a no less "impassable barrier" to the lawful consummation of what is here attempted.

Learned counsel for the capitol commission, apparently recognizing the correctness of the conclusions indicated by what we have thus far said, argues—and this is his principal contention—that since it has been determined in the manner provided by law that the value of the capitol lands, the proceeds from the future sales of which are pledged to the payment of these bonds, exceeds the amount of the obligation to be incurred by their issuance, such lawfully ascertained value may be offset against such obligation for the purpose of showing that the state will not be required to pay any part thereof out of its general revenues. In other words, that the state is incurring this obligation in form only and not in substance, and, therefore, not in violation of the limitations prescribed by the sections of article 8 of the constitution above quoted. In support of this view our attention is called to the decisions of this court in the following cases: *State ex rel. Barton v. Hopkins,* 14 Wash. 59, 44 Pac. 134, 550; *Mullen v. Sackett,* 14 Wash. 100, 44 Pac. 136; *Kelley v.*

*Pierce County*, 15 Wash. 697, 46 Pac. 253; *Rands v. Clarke County*, 15 Wash. 697, 46 Pac. 1119; *Graham v. Spokane*, 19 Wash. 447, 53 Pac. 714.

Each of these cases involved the constitutional debt limit of a city or county, and the decisions rendered therein establish the rule, in harmony with that prevailing in states having a similar constitutional provision as ours as to municipal indebtedness, that the cash assets of a municipality may be deducted from its outstanding indebtedness for the purpose of determining the amount of its indebtedness within the meaning of the constitutional provision limiting such indebtedness. The decisions rendered in these cases also hold that unpaid taxes of the current year, and also unpaid delinquent taxes, constitute a part of the assets of the municipality which may be so deducted from its total outstanding debt for the purpose of determining its amount, within the meaning of the constitutional debt limit. These decisions, it is insisted, are applicable, by analogy, to the solution of the problem here presented, and support the contentions of the capitol commission.

We find ourselves wholly unable to adopt this view. None of these decisions deal with the question of deducting the value of land belonging to a municipality from the total amount of its outstanding debt to determine the amount of such debt within the meaning of the constitutional debt limit provision, and the industry of learned counsel for the capitol commission has not brought to our attention a single decision of any court carrying the rule of deducting assets to the extent of deducting the value of land owned by the municipality from outstanding indebtedness, to escape the restraining effect of the constitutional debt limit provision. We think there are no such decisions. The only authorities relied upon by counsel for the capitol commission in addition to our own decisions above noticed are *Brooke v. Philadelphia*, 162 Pa. St. 123, 29 Atl. 387, 24 L. R. A. 781; and *Bank for Savings v. Grace*, 102 N. Y. 313, 7 N. E. 162. In the *Philadelphia*

case, it appears that the city authorities had purchased, with moneys in its sinking fund, outstanding certificates of indebtedness of the city, the sinking fund being provided for the very purpose of paying such indebtedness, but such certificates being purchased therewith before maturity and at a time when there does not appear to have been any authority for their immediate cancellation. In other words, the city merely invested its sinking fund in the very securities which it was created to retire, at a time when such securities had not fallen due. By this means the city, in effect, became its own creditor. Disposing of the contention that the constitutional debt limit of the city could not be measured by deducting from its total uncanceled debt the face value of these securities which had been so purchased with its sinking fund, the court said, at page 131:

"It is not important in determining the actual debt, that the commissioners have not authority, immediately on purchase, to cancel or destroy the city certificate; it is paid for by the money of the obligor, put into the fund for that very purpose; as an outstanding, unpaid obligation. It can as to the obligor, have no real effective existence after it is purchased and paid for with the city's money. And although the city, in this issue, only claims to deduct from the apparent debt the amount of 6 per cent certificates in the sinking fund, every city certificate in that fund representing a part of the funded debt, and purchased by the commissioners in the redemption or payment of that debt, ceases to be longer a part of the actual debt of the city. That much of the debt the city is no longer bound to pay, because practically it is paid. We are speaking now of the actual obligation of the city as affected by these certificates in the fund, but not yet canceled."

The New York case deals with substantially the same situation, resulting in the same holding. These holdings, it seems to us, go no further than the decisions of this court holding that cash in the treasury of the municipality and unpaid current and delinquent taxes may be deducted from the total outstanding debt to determine the amount of such

debt, within the meaning of the constitutional debt limit provision. Indeed the holdings of the Pennsylvania and New York courts seem to proceed upon the theory that such a condition as there existed had the practical effect of liquidating that portion of the public debt evidenced by the securities which had been purchased by the sinking fund created for the very purpose of paying such indebtedness, although in form the debt so evidenced continued to exist because there was no authority for formally canceling the certificates evidencing such debt.

Counsel for the capitol commission suggests that the holding of the courts that delinquent and current unpaid taxes may be regarded as assets to offset the outstanding indebtedness of a municipality or state is based upon the theory that "in legal contemplation their collection is certain," from which he argues that since the value of the capitol lands has been ascertained in the manner provided by law, such value and its ultimate realization and application to the payment of the bonds here involved is no less certain, and it should, therefore, be regarded as an asset to offset the obligation of the state to be incurred by the issuance of the bonds. We are constrained to disagree with the conclusions to which this ingenious argument seeks to lead. We do not think that the value of the lands is fixed by the appraisement with that legal certainty which the collection of unpaid current and delinquent taxes is attended with. More than that, neither does such appraisement of value fix with legal certainty the fact that there will be a market for such lands capable of producing the amount of the appraisement when offered for sale in the future.

There has been brought to our attention but little aid from the decisions of the courts touching a contention of this nature, but in so far as the decisions throw any light upon the subject, they seem to be against counsel's contentions. In *Walsh v. City Council of Augusta*, 67 Ga. 293, there was involved the constitutional debt limit of the city; and in

measuring the city's authority to contract indebtedness in a certain sum, it was sought to be set up that the city owned property subject to levy and sale outside of that essential for its municipal purposes, amounting in value to some $2,-000,000, which amount was claimed as a reduction in making a statement of its total indebtedness. The court observed:

"Property that the city of Augusta may own outside of the taxable property of her citizens cannot be invoked by subtracting its value to lessen the rate of her indebtedness in the meaning of this constitution, because that instrument itself fixes the per centum as 'upon the assessed value of all the taxable property therein.' Her assets, or indebtedness to her, cannot be deducted from the debt she owes, so as to make that per centum less. It is the debt she has incurred and the per centum of that debt on her taxable property with which alone the constitution deals."

In *Dolan v. Lackawanna Township School Dist.*, 10 Pa. Dist. Rep. 694, the court was asked to deduct from the outstanding indebtedness the value of a lot owned by the district conceded to be worth $1,000, which contractors agreed to accept at that sum in part payment for their construction of a new school building for the district, in order to bring the proposed contract price within the legal debt limit of the school district. Disposing of the contention that the debt limit of the city could be so measured, the court said:

"While the contractors are bound to take the lots at $1,000, the option is left to the school board to let them go at that price. The board may sell them at a higher price, or they may use them for some other purpose and not sell them at all. The incoming board may have different views on the matter. The value of such an item as an asset is too problematical to be considered by us now."

In *Earles v. Wells*, 94 Wis. 285, 68 N. W. 964, 59 Am. St. 885, a case involving an effort on the part of a city to construct water works, incurring a debt therefor beyond its constitutional debt limit, though anticipating that such debt be paid from the revenues of such water works, the court said:

"So long as the current expenses of the municipality are kept within the limits of the moneys and assets actually in the treasury, and the current revenues collected or in process of immediate collection, the municipality may be fairly regarded as doing business on a cash basis, and not upon credit,—even though there may be for a short time some unpaid liabilities. In other words, a municipality's capacity for doing business on such cash basis, with outstanding liabilities, is necessarily measured by the amount of cash on hand and the available assets and resources readily convertible into cash to meet the payment of such liabilities as they become due. But the moment an indebtedness is voluntarily created 'in any manner or for any purpose,' with no money nor assets in the treasury, nor current revenues collected or in process of collection for the payment of the same, that moment such debt must be considered in determining whether such municipality has or has not exceeded the constitutional limit of indebtedness."

We have noticed that these bonds are to run for twenty years, with the privilege to pay or refund the same at the end of any five-year period. It is worthy of note that the legislature did not make any appropriation whatever from its general fund towards the payment of these bonds, or any portion thereof. Indeed, under the constitution, it could in no event have lawfully done so beyond two years following May, 1913; for by § 4, art. 8 of the constitution, it is provided:

"No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within two years from the first day of May next after the passage of such appropriation act."

Therefore, it is plain that the credit of the state is pledged to the payment of these bonds at a time far beyond that which was or could be covered by any appropriation of the legislature of 1913, which authorized their issuance. We are of the opinion that, in so far as it is sought to make these bonds available as an investment for the permanent school

fund, it is, in effect, sought to incur an indebtedness in violation of article 8 of the state constitution; and that, notwithstanding the possibility and even probability that the obligation sought to be so incurred will be eventually liquidated by funds derived from the sales of the capitol land, and thus the burden be entirely removed from the taxpayers, they must nevertheless be regarded as general state bonds for the purpose of investing the general school fund therein. They cannot be regarded as such, in our opinion, without violating both the spirit and the letter of the sections of article 8 of the state constitution above quoted.

We conclude that the relief prayed for by the state capitol commission against the state board of finance must be denied, and that the state board of finance is not required to proceed with the purchase of the bonds with funds belonging to the permanent school fund, for the reason that ch. 59 of the Laws of 1911, as amended by ch. 50 of the Laws of 1913, is unconstitutional in so far as that law assumes to declare that capitol fund bonds purchased by the permanent school fund, shall be "state general bonds"; and in so far as it pledges the general credit of the state to the payment of such bonds.

ALL CONCUR.