[No. 13310. *En Banc.* April 21, 1916.]

THE STATE OF WASHINGTON, *on the Relation of the State Capitol Commission, Petitioner,* v. ERNEST LISTER, *as Governor, et al., Respondents.*[1]

STATES—PUBLIC DEBT—POWER TO CONTRACT—INTEREST ON BONDS—STATUTES. Laws 1915, p. 700, § 3, of the act for bonding the capitol building lands for $1,500,000, the principal payable only from the capitol building fund derived from the sale of the lands, which provides for the levy of an annual tax sufficient to meet the interest on the bonds, the same to be deemed a loan from the general fund and repaid from the proceeds of sales or leases of capitol building lands, is unconstitutional as the creation of a "debt" for such interest charges, within the meaning of Const., art. 8, § 3, providing that no debts except as specified, shall hereafter be contracted on behalf of the state unless authorized by law for some specified object, which law shall provide ways and means, exclusive of loans, for the payment of interest on such debt as it falls due, and also to discharge the principal of such debt within twenty years, and shall be submitted to a vote of the people at a general election; since the interest is not payable from the same source as the principal, but is to be raised by an annual tax, in the "same manner as other state levies are made," in violation of the purpose of the constitution to prevent the taxpayers from being assessed therefor unless authorized by a vote of the people.

SAME. The proceeds of the capitol building lands cannot be considered as an asset equivalent to cash for the purpose of meeting such interest charge.

SAME. The bonding of the state capitol lands for the purpose of erecting buildings and creating a "debt" for interest charges, without submitting the same to a vote of the people, in violation of the

[1]Reported in 156 Pac. 858.

constitution, cannot be sustained on the principle authorizing municipal corporations to exceed their debt limit for the purpose of meeting necessary obligations, as the same is not applicable.

MORRIS, C. J., PARKER, and MOUNT, JJ., dissent.

Application filed in the supreme court January 29, 1916, for a writ of mandamus to compel a bond issue. Denied.

*Ballinger, Battle, Hulbert & Shorts*, for petitioner.

*The Attorney General* and *R. E. Campbell* and *Edward W. Allen, Assistants*, for respondents.

*Davis & Neal, amici curiae.*

MAIN, J.—This is an original application for a writ of mandate. The relator is the state capitol commission. The respondents are the governor of the state and the state auditor. The writ is sought for the purpose of compelling the governor and auditor to execute an issue of $1,500,000 of bonds which are authorized by ch. 191, Laws of 1915, p. 699, the sale of which is contracted for. The purpose of the proceeding is to determine the constitutionality of the act under which the bonds are issued.

The title of this act recites that it is an act relating to capitol buildings and grounds, the powers and duties of the state capitol commission, and the issuance of bonds for state capitol purposes, and providing for a tax levy for the payment of interest.

Section 1 of the act provides that the state capitol commission may, in its discretion, issue coupon or registered bonds of the state of Washington, payable only from the capitol building fund in an amount not exceeding $4,000,000, for the purpose of refunding the warrants outstanding against the capitol building fund, and interest accrued thereon, acquiring additional lands for a site, and erecting and completing buildings for the state capitol; that such bonds shall bear interest at a specified rate; that the state capitol commission may allow a brokerage commission of not to ex-

ceed one-fourth of one per cent on the bonds issued, which is to be paid from the proceeds of the sale of such bonds; that none of the proceeds from the sale of such bonds shall be used for erecting new buildings other than the Temple of Justice until the warrants outstanding against the capitol building fund have been paid or provided for.

Section 2 provides: That the bonds shall, under the provisions of the act, be in such denominations and be payable in such manner and at such times and places not longer than twenty years from date as shall be fixed by the state capitol commission; that the interest shall be paid thereon semiannually at such place or places as the commission shall prescribe; that such bonds shall be signed by the governor and state auditor, under the seal of the state, and any coupons attached to the bonds shall be signed by the same officers; that the bonds may be registered in the name of the holder on presentation to the state treasurer, or at the fiscal agency in the state of New York, as to principal alone, or as to both principal and interest, under such regulation as the state capitol commission may prescribe.

Section 3 of the act is as follows:

"The state capitol commission shall annually, at any meeting next preceding the annual meeting of the state board of equalization, report to such board the estimate of the amount of money necessary to pay all interest charges that may accrue during the ensuing year upon any of the obligations outstanding against the capitol building fund, and the state board of equalization is hereby authorized and required to levy a tax sufficient to raise such amount in the same manner that other state tax levies are made. All moneys thus raised shall constitute a special fund to be known as the capitol building interest fund. All expenditures made from the capitol building interest fund shall be deemed a loan from the general funds of the state, and shall be repaid to the general fund from the proceeds of the sales or leases of capitol building lands and the timber and materials thereon after all other claims against the capitol building funds shall have been paid." Laws 1915, p. 700, § 3.

Section 3 is quoted in full, because it is this section, taken in consideration with a provision of the constitution, which will presently be referred to, which is involved in this controversy. There are other provisions of the act; but those referred to are sufficient to show its general scope and purpose.

It should be noted that, by § 3, the state capitol commission is required, annually, at any meeting next preceding the annual meeting of the state board of equalization, to report to such board the estimate of the amount of money necessary to pay all interest charges that may accrue during the ensuing year upon any of the obligations outstanding against the capitol building fund; that the state board of equalization is required to levy a tax sufficient to raise such amount in the same manner that other state tax levies are made; that the moneys thus raised shall constitute a special fund to be known as the "capitol building interest fund;" that the expenditures made from the capitol building interest fund shall be deemed a loan from the general funds of the state, and shall be repaid to the general fund from the proceeds of the sales or leases of capitol building lands.

According to the terms of this act, the principal of the bonds issued thereunder is payable "only from the capitol building fund;" and the interest charges are to be met by the levy of a tax in the same manner as other state taxes are levied. There is no provision in the act, however, making or attempting to make an appropriation out of this capitol building interest fund to the payment of such interest. The proposed issue of bonds involved here, as already stated, is for the sum of $1,500,000, and bears interest at the rate of four and one-half per cent per annum, payable semiannually.

Sections 1, 2, and 3 of art. 8, of the constitution, are these:

"Sec. 1. The state may, to meet casual deficits or failure in revenues or for expenses not provided for, contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not at any time exceed four hundred thousand dol-

lars ($400,000), and the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained, or to repay the debts so contracted, and to no other purpose whatever.

"Sec. 2.    In addition to the above limited power to contract debts, the state may contract debts to repel invasion, suppress insurrection, or to defend the state in war, but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, and to no other purpose whatever.

"Sec. 3.    Except the debt specified in sections one and two of this article, no debts shall hereafter be contracted by or on behalf of this state, unless such debt shall be authorized by law for some single work or object to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof. No such law shall take effect, until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election, and all moneys raised by authority of such law shall be applied only to the specific object therein stated, or to the payment of the debt thereby created, and such law shall be published in at least one newspaper in each county, if one be published therein, throughout the state, for three months next preceding the election at which it is submitted to the people."

In *State Capitol Commission v. State Board of Finance*, 74 Wash. 15, 132 Pac. 861, it was held, construing an act (ch. 59, p. 319, Laws of 1911, as amended by ch. 50, p. 139, Laws of 1913; 3 Rem. & Bal. Code, § 6704-1 *et seq.*) relative to the bonding of state capitol lands, and providing that the state should guarantee the principal and interest thereon, that such act did not come within either § 1 or § 2 of art. 8 of the constitution.   This is recognized in the present case, and it is not claimed here that either of those sections apply.

It is, however, claimed that the provisions of the act of 1915 which authorizes the levy of a tax for the purpose of paying the interest is not prohibited by § 3 of the constitu-

tion.   This section, it will be observed, provides that "no debts shall hereafter be contracted by or on behalf of this state, unless such debt shall be authorized by law for some single work or object to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof."   The section further provides that, before such law can take effect, it must be "submitted to the people and have received a majority of all the votes cast for and against it" at a general election. The bond issue in contemplation has not been submitted to the people for their approval or rejection.   If, then, the provisions of § 3 of the statute relative to the payment of the interest upon the bonds creates a debt, within the contemplation of § 3 of the constitution above quoted, the bonds cannot be legally issued.

Constitutions being the result of the popular will, the words used therein are to be understood ordinarily in the sense that such words convey to the popular mind.   The meaning to be given to the language used in such instruments is that meaning which a man of ordinary prudence and average intelligence and information would give.   Generally speaking, the meaning given to words by the learned and technical is not to be given to words appearing in a constitution. *Bronson v. Syverson*, 88 Wash. 264, 152 Pac. 1039; *Epping v. Columbus*, 117 Ga. 203, 43 S. E. 803; Cooley, Constitutional Limitations, p. 92; 1 Story, Constitution, § 451, p. 345; Black, Constitutional Law, p. 79.   Other authorities might be cited in support of this rule of construction, but it is so generally recognized that further citation of authority hardly seems necessary.

According to the terms of the act, both the bonds and the coupons are to be signed by the governor and the state auditor, and the seal of the state attached.   When these obligations are issued, they become contracts, the bonds calling for pay-

ment only out of the capitol building fund, and the interest coupons calling for payment out of the capitol building interest fund to be created under the act.

Turning, then, to the word "debt" in the constitution: Does it apply to the interest upon the bonds in question which is evidenced by the coupons attached. This interest becomes due at times and in amounts definite and certain. The plain purpose of providing in the constitution that "no debts shall hereafter be contracted" was to prevent the taxpayers of the state from being called upon to meet obligations which had not been authorized by a vote of the people.

Our attention has been directed to a number of authorities holding that the interest to accrue upon municipal bonds is not to be taken into consideration in determining whether such municipality has exceeded its debt limit. And this is the general rule relative to such corporations, though there are some decisions to the contrary. The constitutional provision relative to municipal corporations is a limitation upon the amount of the indebtedness, and not a prohibition against any indebtedness, as is § 3 of the constitution above quoted. This distinction in the two constitutional provisions is recognized in *State Capitol Commission v. State Board of Finance, supra.* We think it will be found, in the cases involving municipal indebtedness, that the principal of the bonds and the interest were payable out of the same fund or from the same source, and that the interest which was to accrue was looked upon as only an incident, or a future accumulation against which the present limitation of indebtedness might not apply. The principal of the bonds here sought to be sustained is not payable out of the same fund, or from the same source, that the interest is payable from. So far as the question presented in this case is concerned, the interest alone must be looked upon as the "work or object" to be accomplished. It would hardly be contended that unaccrued interest, which was due in a certain amount and at a definite time, evidenced by a formal written document, was not a debt in a certain sense.

The constitution says "no debts shall hereafter be contract-ed." Whether the municipal rule would be applied to state obligations, if the principal and interest were payable out of the same fund, we need not now inquire. The act disassoci-ates the two and puts each in a class by itself. With this disassociation, we think the interest coupons must be held to evidence a debt, within the meaning of the constitution.

If the interest upon these bonds is not to be held a debt, then the door opens, notwithstanding the constitutional pro-vision, for the legislature to bond the lands of the state which are set apart for the various public institutions, and require the interest thereon to be paid by general taxation. There would hardly be any limit to the amount of the bonds that could be issued and the extent to which taxes might be ex-acted in payment of the interest that would accrue. It may be said that this is a remote contingency. But it is not a question whether it is a result probable or improbable; but it is a question whether the constitution permits or would per-mit such expenditures. Support is given to this position by the provisions of the act itself, wherein it is provided that the state board of equalization is "required to levy a tax each year sufficient to meet the interest payments upon the bonds." If the interest is not a present obligation of the state, and therefore not a debt, it would seem that it would not be necessary to provide in the act that an annual tax be levied for that purpose. If the coupons are not evidence of an indebtedness until they become due, surely the state could be trusted to not default in the payment of its obligations as they may accrue from time to time.

It is probably true that the money coming into the capitol building interest fund could not be applied in payment of the interest coupons until it was so appropriated by the legisla-ture; but it may be asserted, with dogmatic certainty, that, if the bonds and coupons should be issued, at no time would the legislature refuse to make an appropriation for the purpose of meeting the matured interest coupons. Refusing to make

the appropriation would be equivalent to repudiátion of the obligation. Such a position on the part of the state is unthinkable. This, however, is beside the question. It is not what the legislature would or would not do; but can the debt be created and the money collected from the taxpayers of the state without the people being heard upon the question when the constitution gives them this right. The act upon its face bears unmistakable evidence of a studied effort to circumvent the constitution. To hold that the interest coupons issued under the provisions of the act are not evidence of a debt, within the meaning of the constitution, would be to give judicial approval to a subterfuge.

The cases of *Griffin v. Tacoma*, 49 Wash. 524, 95 Pac. 1107; *Scott v. Tacoma*, 81 Wash. 178, 142 Pac. 467; *Seymour v. Ellensburg*, 81 Wash. 365, 142 Pac. 875, do not meet the situation here presented. In those cases, it was held that, when money is transferred from the general fund of a municipality to a special fund, which special fund had an assured income the collection of which was under the control of the city, such loans do not imperil the general fund and will not be considered in determining the indebtedness of the city. In those cases, there was a legal certainty that the sum loaned from the general fund would be repaid out of the special fund which had a source of income other and different from that of the general fund. In this case, the source of the income of the capitol building interest fund and the general funds of the state are the same. Both are derived from taxation. The special interest fund is to be raised in the "same manner that other state levies are made." If the moneys that may come into the capitol building interest fund from the sale or leases of state capitol lands is the source looked to for reimbursement, then the answer is that, in the case of *State Capitol Commission v. State Board of Finance, supra,* it was held that the state capitol lands could not be considered as an asset of the state equivalent to cash.

Neither is the rule which permits municipal corporations to exceed their debt limit for the purpose of meeting obligations which are made mandatory upon the municipality by the constitution and the laws of the state, or such as are necessary to maintain their corporate existence, here applicable.

We will not review the numerous cases brought to our attention by the industry of counsel. In a painstaking examination of the authorities cited in the briefs, we have found no case in point upon the issue here presented. Indeed, as we understand the briefs, it is not claimed that any of the authorities therein cited are exactly in point; but they are cited more by the way of argument than as deciding the precise question.

The writ will be denied.

HOLCOMB, ELLIS, FULLERTON, BAUSMAN, and CHADWICK, JJ., concur.

PARKER, J. (dissenting)—I do not think that the act of 1915 (Laws 1915, ch. 191, p. 699) here in question is so clearly unconstitutional as to warrant the court in so holding. As I read its provisions, they do not irrevocably pledge the general credit of the state to the payment of the interest on the bonds for the issuance of which it provides. It is true, the act does authorize the levy of a tax annually to pay the interest on the bonds, but I do not see in its terms any pledge that the state will continue to do so and not repeal that provision of the act. Future legislatures may feel morally obligated to make appropriations for the payment of such interest from the general fund, as every legislature since the year 1901 has made appropriations from the general fund for the payment of interest upon the capitol building fund warrants, though not legally bound to do so; but this act, I think, contains no pledge that it will not be repealed in that particular or that such appropriations will be made. I am of the opinion that the act should not be held unconstitutional,

and therefore dissent from the views of my brethren as expressed in the foregoing opinion.

It may be that the form of the bonds as proposed to be issued by resolution of the state capitol commission, the execution of which by the governor and auditor would be a mere ministerial act, do in terms pledge the general credit of the state to the payment of the interest thereon. If the bonds proposed to be issued are susceptible of this construction, I concede that they ought to be changed so as to not pledge the general credit of the state; since, as I read the act, that is not authorized by its terms. This, however, is a mere minor matter of detail and becomes of no consequence in the light of the decision of the majority holding the act unconstitutional.

MOUNT, J., concurs with PARKER, J.

MORRIS, C. J. (dissenting)—I join in the views of Judge Parker; but the chief reason for my dissent is that the provision of the act to annually levy a tax in an amount equal to the interest to accrue upon the bonds and to place such money in the capitol building interest fund does not constitute the contracting of a debt. It therefore seems to me that the issuance of these proposed bonds is in no sense a debt against the state, nor is the credit of the state loaned in violation of any constitutional provision. For these reasons, I dissent.