[No. 3292, Sept. 8, 1927.]

STATE v. GRAHAM.

[259 P. 623.]

SYLLABUS BY THE COURT

1. By virtue of the 1921 constitutional amendment (article 9, § 16 [see Laws 1921, p. 478], debentures to anticipate proceeds of gasoline excise tax, authorized by Laws 1927, c. 20, do not constitute such state borrowing or debt as requires popular referendum.

2. Debentures to anticipate proceeds of gasoline excise tax, authorized by Laws 1927, c. 20, are eligible as an investment for permanent school fund, by virtue of Laws 1927, c. 4, though the provisions of chapter 20 to render them so eligible failed of passage by a vote of three-fourths of the members elected to each house, as required by Constitution, art. 12, § 7.

BICKLEY, J., dissenting.

Appeal from District Court, Santa Fe County; Holloman, Judge.

Suit by the State against Warren R. Graham for an injunction. From a judgment sustaining a demurrer to the complaint, the State appeals. Affirmed and remanded.

Robert C. Dow, Atty. Gen., and Frank H. Patton, Asst. Atty. Gen., for the State.

Carl H. Gilbert, of Santa Fe, for appellee.

OPINION OF THE COURT

WATSON, J. [1] Chapter 20, Laws of 1927, imposes an excise gasoline tax, to be paid into the state treas-

---

[1] 36 Cyc p. 989 n. 98 New.     [2]     35 Cyc p. 827 n. 32.

ury and covered into the state road fund, "to be used for maintenance, construction and improvement of state highways and to meet the provisions of the Federal Aid Road Law." Section 2. In anticipation of this revenue, the state highway commission is authorized to issue interest-bearing debentures, not to exceed one and a quarter million dollars in any one year. The debentures are to be signed by the president of the commission, to be attested by its secretary, to bear the commission's seal, and to be countersigned by the state treasurer. They are to constitute an irrevocable contract, between the state and the holders, against any repeal or reduction of the tax, and that the state will cause prompt collection of the same and the setting aside of sufficient of the proceeds thereof to pay principal and interest.

The state board of finance having given its approval of an investment of the permanent school fund of the state in these debentures, this suit was commenced by the state, by its attorney general, to enjoin such investment. The state's objections are that the proposed issuance of debentures would be in violation of Constitution, Art. 9, §§ 7, 8, requiring a popular referendum before the creation of a state debt in such an amount, and that the proposed investment of permanent school funds therein would be in violation of Constitution, art. 12, § 7, requiring legislative authorization by a three-fourths vote of the members elected to each house, except in the case of certain enumerated bonds.

The state treasurer demurred to the complaint, and the state appeals from a final judgment entered upon the sustaining of the demurrer.

Constitution, art. 9, §§7, 8, provide as follows:

"Sec. 7. The state may borrow money not exceeding the sum of two hundred thousand dollars in the aggregate to meet casual deficits or failure in revenue, or for necessary expenses. The state may also contract debts to suppress insurrection and to provide for the public defense.

"Sec. 8. No debt other than those specified in the preceding section shall be contracted by or on behalf of this state, unless authorized by law for some specified work

or object; which law shall provide for an annual tax levy
sufficient to pay the interest and to provide a sinking fund
to pay the principal of such debt within fifty years from
the time of the contracting thereof. No such law shall take
effect until it shall have been submitted to the qualified
electors of the state and have received a majority of all
the votes cast thereon at a general election; such law shall
be published in full in at least one newspaper in each
county of the state, if one be published therein, once each
week, for four successive weeks next preceding such elec-
tion. No debt shall be so created if the total indebtedness
of the state, exclusive of the debts of the territory, and the
several counties thereof, assumed by the state, would there-
by be made to exceed one per centum of the assessed valua-
tion of all the property subject to taxation in the state as
shown by the preceding general assessment."

In 1921 article 9 was amended by the adoption of
section 16. See Laws 1921, p. 478. The amendment
provides as follows.

"Section 16. Laws enacted by the Fifth Legislature auth-
orized the issue and sale of state highway bonds for the
purpose of providing funds for the construction and im-
provement of state highways and to enable the state to
meet and secure allotments of federal funds to aid in con-
struction and improvement of roads, and laws so enacted
authorizing the issue and sale of state highway debentures
to anticipate the collection of revenues from motor vehicle
licenses and other revenues provided by law for the state
road fund, shall take effect without submitting them to the
electors of the state, and notwithstanding that the total in-
debtedness of the state may thereby temporarily exceed one
per centum of the assessed valuation of all property
subject to taxation in the state. Provided, that the
total amount of such state highway bonds payable from
proceeds of taxes levied on property outstanding at any one
time shall not exceed two million dollars. The Legislature
shall not enact any law which will decrease the amount of
the annual revenues pledged for the payment of state high-
way debentures to any other purpose so long as any of the
said debentures issued to anticipate the collection thereof
remain unpaid."

Article 12, § 7, of the Constitution provides as fol-
lows:

"The principal of the permanent school fund shall be
invested in the bonds of the state or territory of New
Mexico, or of any county, city, town, board of education
or school district therein. The Legislature may by three-
fourths vote of the members elected to each house provide
that said funds may be invested in other interest-bearing
securities. All bonds or other securities in which any por-
tion of the school fund shall be invested must be first ap-

proved by the Governor, Attorney General, and secretary of state. All losses from such funds, however occurring, shall be reimbursed by the state."

Chapter 20, Laws 1927, contains as a separate paragraph in section 2 the following provision:

"The state treasurer may, with approval of the state board of finance and other officials whose approval is required by law for investment of public funds, purchase such debentures at par and accrued interest for such investment without advertising or offering them for sale or after rejection of bids for all or part of any issue."

This act was not passed by a three-fourths vote of the members elected to each house. But chapter 4, Laws of 1927, was enacted by such three-fourths vote. Section 1 of that chapter reads as follows:

"The principal of the permanent school fund and any other public funds may be invested in interest bearing state highway debentures authorized by law issued before or after the passage of this act to anticipate the collection of tax levies, licenses, motor vehicle registration fees, gasoline taxes or other revenues or income at any time provided for the state road fund or for construction or maintenance of public highways or bridges in this state.

"Upon approval by the state board of finance and other officials whose approval is required by law for such investment, the state treasurer may purchase such debentures at par and accrued interest without advertising or offering them for sale notwithstanding that the law authorizing their issue may have provided that they be sold to the highest bidder after advertising."

Upon the facts above stated and the several constitutional and legislative provisions above set forth, counsel, by their arguments and briefs, raise the following questions: (1) Do the debentures proposed to be issued constitute a borrowing of money by the state, or the contracting of a debt by or on behalf of the state, within the meaning of Constitution, art. 9, §§ 7, 8? (2) If so, is the necessity of submitting the questions of their issuance to the electors of the state obviated by Constitution, art. 9, § 16, the 1921 amendment? (3) Is the fact that Laws 1927, c. 20, failed to receive a three fourths vote of the members elected to each house fatal to the proposed investment of the permanent school fund?

We find that we may dispose of this case without deciding the first question. We assume, merely for the purposes of this decision, that the debentures do constitute a borrowing of money by the state and a contracting of a debt by or on behalf of the state.

This brings us to the second question. The Attorney General contends that the only effect of the constitutional amendment (article 9, § 16) was to ratify "laws enacted by the Fifth Legislature" (1921). If he is correct, the second question must receive a negative answer:

The general purpose of the amendment was obviously to except certain laws from the operation of article 9, §8, requiring popular approval of the creation of state indebtedness, and limiting the total indebtedness to be created to 1 per centum of assessed valuation. The question is whether chapter 20, Laws 1927, falls within the exception.

This being a constitutional provision, we should expect a care in drafting and an exactness in expression not always to be found in ordinary legislation. We should expect to be able to refer to "laws" (more than one), enacted by the Fifth Legislature, authorizing the issuance and sale of state highway bonds, and also to "laws" (more than one) authorizing the sale of debentures. In fact, we find one law (chapter 167) authorizing the issuance and sale of bonds, and one law (chapter 153) authorizing the sale of debentures. Chapter 153, however, authorizes such debentures, not "to anticipate the collection of revenues from motor vehicle licenses," but to anticipate the proceeds of tax levies; and, so, if contemplated at all by the amendment, included only in the expression "other revenues provided by law for the state road fund." So we find that the exact meaning of the words employed cannot be relied upon in interpreting this constitutional amendment.

Since chapters 153 and 167 seem to be the only acts of the Fifth Legislature which could be affected by the amendment, we should take notice of the conditions call-

ing for the passage of these acts. At that time some $4,000,000 was available for allotment to New Mexico as federal aid in the construction of roads. To get it, the state and the several counties to be benefited must raise like amounts. The state must conduct a large borrowing operation at once, or suffer a large loss of prospective benefit. Chapters 153 and 167 represent the financial measures taken by the state to meet this situation.

Chapter 167 provided for a state bond issue of $2,-000,000. As the bonds were authorized to be marketed from time to time as the money was required, no provision was needed for anticipating the proceeds of the sale, and none was made. By chapter 153 the several boards of county commissioners were authorized and directed to make a 2-mill levy in each of the years 1921, 1922, and 1923; the proceeds of which were to go into the state road fund, and to be used for the same purposes for which the proceeds of the sale of state bonds authorized by chapter 167 were to be used. Since these tax collections were spread over a period of three years, it was necessary to provide that the state highway commission might issue debentures in anticipation of them.

It may well be contended that the language, "Laws enacted by the Fifth Legislature authorized the issue and sale of state highway bonds for the purpose of providing funds for the construction and improvement of state highways and to enable the state to meet and secure allotments of federal funds to aid in construction and improvements of roads," has special and particular reference to chapter 167 enacted by the Fifth Legislature. On the other hand, the language, "Laws so enacted authorizing the issue and sale of state highway debentures to anticipate the collection of motor vehicle licenses and other revenues provided by law for the state road fund," does not aptly or correctly describe any law enacted by the Fifth Legislature. It does, in fact, describe an enactment of the Fourth Legislature, Laws 1919, c. 154. This chapter amended chapter 38 of the Laws of 1917 by which a certain tax levy and one-

half the net revenues derived from motor vehicle li-
censes were set aside for the state road fund. Among
the provisions of chapter 154 was this:

"The state highway commission is hereby authorized to
anticipate the proceeds of the collection of the said tax
levies and licenses, or other revenues or income at any time
provided for the state road fund, by the issuance and sale
* * * of certificates or debentures. * * * " Section 2.

So it would seem that if the language of the amend-
ment now under consideration had reference or appli-
cation to any existing enactment, it was to an act of
the Fourth Legislature.

The Attorney General argues that the term "so en-
acted," referring to debentures, means enacted just
as the state bonds provision was enacted—that is, by
the Fifth Legislature. That is an admissible and per-
haps preferable conclusion, if grammatical construction
only is to be considered. But when we find that there
have been no laws "so enacted," another interpretation
must be sought. Some law, either past or future, must
have been in contemplation providing for the antici-
pation of the proceeds of revenues from motor vehicle
licenses. No law of the Fifth Legislature answers that
description. The Fourth Legislature is not mentioned.
There is no reason to say that "so enacted" refers to
any act of the Fourth or any other particular Legisla-
ture except the Fifth. If it does not refer to the Fifth,
it may as well refer to the Legislature or any Legisla-
ture.

If the word "so" had been omitted there would be
no difficulty in interpreting the amendment as apply-
ing to laws at any time enacted. The word "so" may
simply refer to "laws enacted by the * * * Legislature."
We attach that meaning to it, because otherwise the
mere inclusion of the word renders inapplicable an im-
portant and deliberately included provision of the am-
endment.

This conclusion is strengthened by consideration of
the fact that the method employed to effectuate the
purpose was that of amending the Constitution. Unless

permanency and future application were desired, the
Constitution required no amendment.  A mere popular
ratification of the particular act was all that was need-
ed.  Under the conditions then to be foreseen and since
existing, it would often be necessary to make expendi-
tures for highway construction and maintenance in ad-
vance of the actual collection of the revenues dedicated
to that purpose.  It would greatly handicap such oper-
ations if each must receive popular approval at a ref-
erendum.

If ratification only was intended, it would have been
sufficient to say that the laws enacted by the Fifth Leg-
islature, or theretofore enacted, authorizing the issue
and sale of bonds and debentures for road purposes,
were ratified.  Why, then, the complex provision we
have, when a much simpler one would have accomplish-
ed the purpose?

It may be that section 16 was intended to perform the
double office of ratifying the particular bond issue au-
thorized by chapter 167, and of establishing a new con-
stitutional policy as to sales of highway debentures in
anticipation of the collection of revenues. It is not un-
reasonable that the people should be willing to relin-
quish control over anticipatory debentures while retain-
ing control over bonds.  The former are short-time ob-
ligations to be retired from revenues already assured.
The latter are real and permanent additions to the pub-
lic debt. There is an important practical distinction.

There is an objection to the theory that, as to high-
way bonds, the amendment was intended merely to
ratify chapter 167. It is found in the provision that:

"The total amount of such state highway bonds payable
from proceeds of taxes levied on property outstanding at
any one time shall not exceed two million dollars."

Unless future operations were contemplated, what
was the purpose of this provision? However, we are
here concerned with anticipatory debentures only.  We
can only decide the bond question when it shall reach
this court.  As to "debentures to anticipate the col-

lection of revenues from motor vehicle licenses and other revenues provided by law for the state road fund,'' we hold that there need be no referendum.

[**2**] We still have the third question. The Attorney General's position is this. Although article 12, § 7, of the Constitution permits investment of the permanent school fund in any ''other interest-bearing securities,'' if the Legislature shall so provide ''by three-fourths vote of the members elected to each house,'' and although the Legislature did, by the requisite vote, by chapter 4, Laws 1927, provide for such investment in debentures such as these, yet the application of chapter 4 to these particular debentures is prevented by the fact that a substantially similar authorization was included in chapter 20, Laws of 1927, and failed to become operative or effective because that act did not receive the requisite three-fourths vote of the members elected to each house.

It is not, and could not be, contended that chapter 4 has been repealed. Such a contention would involve the proposition that a minority, opposing the passage of chapter 20, could effect the repeal of chapter 4, passed by the extraordinary majority, and the proposition that a provision of chapter 20 which failed of enactment, and is a nullity, could yet react on chapter 4, to repeal it. The Attorney General's argument is that, as to the particular debentures authorized by chapter 20, reliance was not placed on chapter 4 to render them eligible as an investment for the permanent school fund; that, by including the provision in the bill, the question was presented to the Legislature whether the particular debentures should be so eligible and the proposition was defeated.

Of course, the Legislature was not bound by the general policy adopted by chapter 4, so that it could not have provided differently by chapter 20 as to the particular debentures there authorized. But it did not provide differently. The bill sought, unnecessarily, to repeat or renew the same provision. The vote was

on the bill as a whole, not on any particular provision. The principal difference of opinion, as was well known, was as to the wisdom of levying a 5-cent tax on gasoline. The vote does not necessarily indicate any opposition to a policy of investment of public funds which had already been adopted by the same Legislature. If the provision in question had been submitted to a separate vote by a separate bill, the Attorney General's contention would have been sound. We do not wish to be understood as suggesting that this court may inquire into the particular motives which may have induced individual legislators to vote for or against a proposed measure. We merely illustrate the fallacy of the reasoning. The Attorney General concedes, we think correctly, that, in the absence of later legislative action, chapter 4 would have been sufficient authority for the investment. There has in fact been no later action. Chapter 4 stands unimpaired and is sufficient legislative warrant for the proposed investment.

It follows that the district judge properly denied the injunction. The judgment will be affirmed and the cause remanded.

It is so ordered.

PARKER, C. J., concurs.

BICKLEY, J. (dissenting).    I regret that I am unable to agree with the decision of my associates.

The language of a Constitution is to be construed in its popular sense. In Crick v. Rash, 190 Ky. 820, 229, S. W. 63, it is said:

"The rule for the interpretation of Constitutions, as universally applied, is that the language therein is to receive its plain and ordinarily understood meaning by the generality of the people. Constitutions are many times actually, and always in theory, adopted by the people, and their language is presumed to contain the meaning which the people generally attribute to the words employed. In this respect the rules for the interpretation of Constitutions differ from the ones applied in the construction of statutes."

See, also, State v. Lister, 91 Wash. 9, 156 p. 858, and Cooley's Constitutional Limitations, p. 92. Applying

these well-settled rules to the present case, what is the
meaning of the phrase "so enacted" in the Eleventh
Amendment to our Constitution? The majority refer
to chapter 153, "An act authorizing and directing
boards of county commissioners to levy taxes for each
of the years 1921, 1922 and 1923 for construction and
improvement of public highways and to meet dollar for
dollar allotments to the state of federal funds under
the Federal Aid Road Act, and for other purposes,"
and chapter 167 of the same legislative session (1921)
"An act authorizing the issue and sale of state highway
bonds in the sum of two million dollars to provide funds
for the construction and improvement of state high-
ways and to enable the state to meet and secure allot
ments of federal funds to aid in construction and im
provements of roads: providing a tax levy for payment
of interest and principal of said bonds."

. It is to be noted that each of those acts was approved
on March 12, 1921, which was the day upon which the
Legislature adjourned. It appears that both acts were
house bills, and chapter 167 bears an earlier number
than chapter 153. Section 10 of chapter 167 provides
that:

"Th's act shall take effect on the first day of December
1921, in case the amendment to the Constitution of the
state of New Mexico proposed by the Fifth Legislature,
providing that laws enacted authorizing the issue and sale
of bonds as provided by this act shall take effect without
submitting them to the electors of the state, shall be rati-
fied by a majority of the electors voting thereon at the
special election to be held on constitutional amendments.
If such amendment should not be ratified then this act
shall 1 e submitted to the qualified electors of this state,"
et·. "Provided, that no bonds or debendtures shall be is-
s· ed or sold under this act until the people of New Mex-
ico shall have voted upon and ratified a constitutional am-
endment which will permit this act to become effective."

So, it seems that the amendment in question had al-
ready been proposed by the Fifth Legislature prior to
the enactment of chapter 167. If it is true that the
amendment was proposed prior to the enactment of
either chapters 153 or 167, the argument of the major-
ity loses some of its force. I presume that a constitu-

tional amendment could be proposed, having for its purpose the ratification of acts done by the Legislature after such proposed amendment was introduced and authorized by the Legislature. Under such circumstances, the Legislature proposing the amendment would not know whether the Legislature would direct that the state highway debentures should be paid through the anticipation of the collection of revenues from motor vehicle licenses, or through revenues provided by law for the state road fund.

By the rules of interpretation, "and" may be, and often should be ,read as "or" according to the context. The majority say:

"Chapter 153, however, authorizes such debendtures, not 'to anticipate the collection of revenues from motor vehicle licenses,' but to anticipate the proceeds of tax levies; and, so, if contemplated at all by the amendment, included only in the expression 'other revenues provided by law for the state road fund.' So we find that the exact meaning of the words employed cannot be relied upon in interpreting this constitutional amendment."

I have no reason to doubt that chapter 153 was contemplated by the amendment. This court so held in Lopez v. State Highway Commission, 27 N. M. 300, 201 P. 1050. That case was decided on September 24, 1921, only four days after the election at which the Eleventh Amendment was adopted. If any significance is to be attached to the historical element, it is assumed that the court at that time was equipped with full knowledge of the history of the measures. Some of the same questions were raised in that case as are raised in this, and the court's conclusion was that chapter 153 was validated and ratified by the adoption of the amendment. The court there thought that the language of the amendment did aptly and correctly describe chapter 153, enacted by the Fifth Legislature. If the court had been of the opinion that the debentures therein provided for must be paid by anticipating "the collection of revenues from motor vehicles licenses and other revenues provided by law for the state road fund." it would doubtless have concluded that such words did not aptly or correctly describe said chapter

153.

It seems reasonable that the Legislature by the proposed amendment intended to validate, ratify, and cause to "take effect" the laws on the subject enacted by the Fifth Legislature, whether they authorized state highway bonds or state highway debentures, to anticipate the collection of revenues from motor vehicle licenses or (and) other revenues provided by law for the state road fund. As the majority have pointed out, both methods had previously been in use, and there is no reason to suppose that the Legislature intended the language of the amendment to require that both must be used at the same time and in the same act.

The word "so" is defined by the Lexicographers as:

"In that manner; in such manner."

"(c) In the manner previously noted or understood."

"5. In such way as aforesaid; in the aforesaid state or condition; the same; a pronominal adverb used especially for the sake of avoiding repetion." Century Dictionary.

See, also, Words and Phrases, First and Second Series.

My brethren agree that the Attorney General's contention that the term "so enacted," referring to debentures, means enacted just as the state bond provision was enacted; that is, by the Fifth Legislature, is an admissible and perhaps preferrable conclusion, if grammatical construction only is to be considered, but they say when we find there have been no laws "so enacted" another interpretation must be sought. It would seem that such argument proceeds partly upon the theory that the amendment was proposed after the Fifth Legislature had finished with its enactments and referred therefore to what had been enacted. This does not necessarily follow, and the contrary seems likely.

The majority say:

"The word 'so' may simply refer to 'laws enacted by the * * * Legislature.' "

This seems hardly likely, because the Legislature is

the only body which can enact laws .and there would be no reason for using the word "so" if the reference were simply to the Legislature.

The majority think that this conclusion is strengthened by a consideration of the fact that the method employed to effectuate the purpose was that of amending the Constitution, and that unless permanent and future application was desired, the Constitution required no amendment, a mere popular ratification of the particular act was all that was needed. I do not so understand it. Section 8 of article 9 of the Constitution provided a debt limitation of 1 per centum of the assessed valuation of all the property subject to taxation in the state. Apparently it was contemplated that the enactments of the Fifth Legislature for state highway bonds and state highway debentures would exceed these debt limitations, and therefore the constitutional amendment was necessary in order to validate such enactments.

The majority think that it is not unreasonable that the people should be willing to relinquish control over anticipatory debentures while retaining control over bonds, for the reason that the former are short-time obligations, to be retired from revenues already assured, and the latter being real and permanent addition to the public debt. This is speculation. There is nothing in the amendment which limits the length of time which either form of indebtedness is to run. If the Legislature could create an irrevocable contract for the payment of highway debentures from the revenues from motor vehicle licenses and (or) other revenues provided by law for the state road fund for a period of five years, there is nothing in the amendment which would prevent the Legislature from making such a contract to run for ten years or a longer period.

The word "debenture" is defined as:

"An instrument in the nature of a bond, given as an acknowledgment of debt, and providing for repayment out of some specified fund or source of income." Standard Dictionary.

It seems probable that the amendment under consideration and chapter 167 and chapter 153 were all a part of one plan for raising revenues to meet the federal aid funds. It is to be noted that in section 10 of chapter 167 the Legislature spoke of bonds or debentures as being in the same class; that is, they used the words interchangeably in providing that no such **bonds** or **debentures** should be issued or sold under that act until the people of New Mexico had voted upon and ratified the constitutional amendment.

It seems to me that the Legislature was of the opinion that the constitutional amendment was necessary in order to validate both state highway bonds and state highway debentures to be issued without submission to the qualified electors and in excess of the 1 per centum limitation even with such submission, regardless of the source from which the. money was to be derived to pay them, in the absence of a vote of the electors, and in the event of exceeding the debt limitations therefore provided.

This court seemed to be of the opinion in 1921, in Lopez v. State Highway Commission, supra, that the amendment was of a validating and ratifying character, and for that reason found it unnecessary to consider the assault made on the debentures. Such seems a reasonable conclusion. In the proposed amendment is associated together the state highway bonds and the state highway debentures in taking them out of the 1 per per cent debt limitation of section 8. art. 9, "notwithstanding that the total indebtedness of the state may thereby temporarily exceed one per centum of the assessed valuation of all the property subject to taxation in the state." The use of the word "temporarily" indicates that the amendment purported to deal with the road-financing program of the Fifth Legislature, and not the establishment of a permanent policy.

The Legislature also associated the two forms of securities together in respect to dispensing with the requirement of submission to the electors for approval. It seems plain that as to state highway bonds the am-

endment contemplated those authorized by the **fifth Legislature,** and I am unable to find plain and clear reasons for separating what the amendment by language as ordinarily understood associated together; and I am unwilling, by interpretation, to hold that the amendment established a new constitutional policy of a permanent character as to sales of highway debentures in anticipation of the collection of revenues belonging to the road fund. It seems to me that the constitutional amendment was proposed on the basis of the laws which might be enacted by the Fifth Legislature and was adopted by the people on the basis of what had been done, and that the electors were not committing themselves to a permanent policy of relinquishing control over the public debt, even though such debt is to be paid out of excise taxes or revenues to be derived from special levies or taxes, to anticipate the payment of the debt.