46 P.(2d) 1097

**STATE ex rel. CAPITOL ADDITION BLDG. COMMISSION v. CONNELLY.**

No. 4114.

Supreme Court of New Mexico.

June 14, 1935.

Frank H. Patton, Atty. Gen., and Quincy D. Adams, Asst. Atty. Gen., for relator.

H. A. Kiker, Marcia Hertzmark, and A. M. Fernandez, all of Santa Fe, for respondent.

SADLER, Chief Justice.

The state, at the relation of Capitol Addition Commission, invokes our original ju-

risdiction in mandamus to compel James J. Connelly, as state treasurer, to countersign certain debentures authorized under the provisions of chapter 14, Special Session Laws of 1934, being an act entitled, "An Act Authorizing the Construction of an Addition to the Capitol Building, Providing Funds for the Construction and Equipment of a Building at Santa Fe to be Known as the 'Capitol Addition Building,' imposing an Additional Fee Upon Civil Actions Filed in the District Courts of the State of New Mexico to Provide for the Payment of Interest and Principal Authorizing the Issue and Sale of Debentures to Provide Funds Therefor, and Creating a Building Commission and Vesting Powers in such Commission," approved April 27, 1934.

The petition in mandamus, after alleging that relator is the duly constituted Capitol Addition Commission composed of J. O. Seth, Herbert B. Gerhart, and Daniel T. Kelly, discloses that funds with which to construct and equip the building contemplated by the act under the terms thereof are to be supplied by a fee of $2.50 levied upon every civil action filed in the office of clerks of the various district courts of the state; but, in order to render such funds immediately available, the relator and respondent are authorized to anticipate proceeds of the levy of such fee "by the issuance and sale of capitol addition building debentures in such amounts, not exceeding in the aggregate one hundred seventy-five thousand ($175,000) dollars, at such times and bearing interest at such rates, not exceeding four per centum per annum, as the said commission may determine."

The act, as shown by the petition, further provides that the debentures shall be signed by the chairman of the Capitol Addition Commission, attested by its secretary, with the seal of the commission affixed, and countersigned by respondent as state treasurer. Interest coupons are also to be attached bearing the facsimile signature of respondent, calling for semiannual installments of interest.

Further allegations of the petition disclose that relator, conformably to provisions of the act, and by resolution duly adopted, has determined upon the immediate issuance and sale of authorized debentures in the amount of $100,000, in denominations of $500 each, carrying interest and maturities as provided by the act; that same have been duly signed, attested, and sealed by the chairman and secretary of relator, and presented to respondent for his counter signature, as required by the act, with a written request that he proceed in accordance with the duty imposed upon him by section 15 of the act to offer said debentures for sale.

The respondent's written refusal to countersign and sell said debentures is then pleaded, the ground advanced for so refusing being respondent's opinion that the is-

suance of same under authority of the act in question would be in violation of the Constitution of the state of New Mexico.

Upon filing and presentation of relator's petition in mandamus, we ordered issuance of the alternative writ. Respondent's answer, after admitting all allegations of fact in the petition, clarifies the somewhat general nature of the ground of his refusal set forth in the letter to relator antedating suit. His answer herein discloses that the particular constitutional provision moving him to question validity of the proposed debentures is article 9, §·8. He contends that the debt proposed to be created by the issuance of said debentures is such a debt as is prohibited by the article of the Constitution in question, viz., a general obligation on the part of the state, requiring approval by a majority vote of the qualified electors upon submission at a general election, and compliance with all other provisions of said article incident to lawful creation of such a debt.

In addition to this vital objection, respondent also raises certain practice questions, viz., (a) that Capitol Addition Commission is not a proper party relator, and (b) that this court should not entertain original jurisdiction of the cause, particularly at the instance of a private suitor. The main objection to Capitol Addition Commission as party relator lies in the assertion that it is not by the act created a body corporate, nor authority conferred

for suits against it, nor expressly for suits by it except in the single case of condemnation suits. The objection to an exercise of original jurisdiction is that to do so violates the declared policy of this court as laid down in State ex rel. Owen v. Van Stone, 17 N. M. 41, 121 P. 611, not to exercise its original jurisdiction in the matter of granting the prerogative writs, in the absence of some controlling necessity, of which it is the sole judge, and not to do so in any case brought at the instance of a private suitor.

All parties agree that the state is here the real party plaintiff in interest. To hold, if we should resolve these procedural questions, that the present relator lacks capacity or is not a proper party relator, would be but to sacrifice substance to form. An amendment would naturally follow substituting the state as the real as well as the nominal party plaintiff, a result which we now have power to accomplish through proper order. And so, without deciding the question, but with consent of the parties as expressed at oral argument, the petition, writ, and all subsequent orders, pleadings, and proceedings will be deemed amended by substituting as plaintiff herein the name of the state upon relation of the Attorney General. So amended, we entertain no doubt of our right within the policy declared in State ex rel. Owen v. Van Stone, supra, to entertain original jurisdiction of the cause.

We are thus brought to a consideration of the main question presented, to wit, Will the debentures in question, when issued, constitute a general obligation on the part of the state? If so, the respondent is right in his refusal to countersign and sell the same, since admittedly the law authorizing such debentures has not been submitted to a vote of the qualified electors of the state, much less approved by them. The relator rests its case upon the contention that the debentures, when issued and sold, will create no debt within the fair intendment and meaning of the constitutional provision invoked by respondent. Whether it does involves a construction of the terms of the act, in the light of applicable constitutional provisions.

The act carries an appropriation of $175,000 for the purpose of constructing and equipping a building to be known as Capitol Addition or Supreme Court building, "wherein shall be officed the Supreme Court of the State of New Mexico, the State Library, the Department of Justice, and the State Treasurer." Section 1. A fee of $2.50 is levied upon each and every civil action filed in the office of the clerks of the various district courts, to be paid to the clerk by the party filing the action, in addition to the ordinary docket fee provided by law. The $2.50 fees so collected must be kept by the clerk in a separate fund and remitted to the state treasurer on the first day of each month, "for the purpose of paying the principal and interest on the debentures herein authorized to be issued and sold." Section 4. When a sufficient sum has been thus realized to pay the unpaid principal and interest of every debenture so issued, as and when payable, the state treasurer is directed to certify such fact to the various district clerks, who thereupon shall cease collecting the fee imposed.

As heretofore stated, the act authorizes the Capitol Addition Commission and respondent to anticipate the proceeds of the collection of the fee imposed by issuing and selling debentures in the aggregate sum of $175,000. While the form of said debentures is not set out in the statute, the substance of what they shall provide is declared therein. The date they shall bear, their maximum rate of interest, and maturities are provided. They are to be serial in form and payable in their serial order. Interest coupons are to be attached. They are made payable as to both interest and principal at the office of the state treasurer at Santa Fe, N. M.

Section 12 of the act provides: "Sec. 12. The issue and sale of said debentures shall constitute an irrevocable and irrepealable contract between the state of New Mexico and the owner of any of said debentures, that the taxes and/or fees pledged for payment thereof, at the rate now provided by this law shall not be reduced so long as any of said debentures remain outstanding

and unpaid, and that the state will cause said taxes and/or fees to be promptly collected and set aside and applied to pay said debentures and interest according to the terms thereof. Any holder of any of the debentures issued pursuant to the provisions of this act, or any person or officer being a party in interest, may either at law or in equity by suit, action or mandamus, enforce and compel the performance of the duties required by this act of any officer or person herein mentioned."

The last paragraph of section 13 reads: "The state treasurer shall keep separate accounts of all moneys collected under the taxes and/or fees hereby imposed for the payment of the interest and to provide a sinking fund for said debentures, respectively, and shall from time to time invest the moneys in said sinking fund in any bonds or other securities issued by the United States of America or the state of New Mexico at their market value; Provided such bonds or other securities will mature before the maturity of the debentures for which the sinking fund is created."

Three New Mexico cases are cited and chiefly discussed by counsel on both sides of the present controversy. They are: State v. Graham, 32 N. M. 485, 259 P. 623, State v. Regents of University of New Mexico, 32 N. M. 428, 258 P. 571, 572, and Seward v. Bowers, 37 N. M. 385, 24 P.(2d) 253. Relator's counsel insist the two cases last cited are decisive of the

question now being considered and entitle relator to an order making the alternative writ absolute.

Counsel for respondent, on the contrary, although perhaps conceding that as far as they go these two cases are favorable to relator's position, seek to distinguish them. Their appraisement of the three cases cited above is set forth in the following quotation from respondent's brief, to wit:

"The cases decided by our Supreme Court do not decide the point in question.

"The case of Seward v. Bowers, 37 N. M. 385, 24 P.(2d) 253, is decided on the doctrine of a 'special fund' derived from revenue to be furnished by the very thing to be purchased with the proceeds of the bonds. It is in the nature of a lien for the purchase price on the revenue on the thing itself and not a pledge of other revenue, credit, or property of the state.

"The case of State v. Regents, 32 N. M. 428, 258 P. 571, is decided on the doctrine of a 'special fund,' consisting of the income of lands belonging to the University, and not a pledge of other revenue, credit or property derived from some other source as in the case at bar. The case of State v. Graham, 32 N. M. 485, 259 P. 623, clearly does not decide the point. For the purpose of that decision, the Supreme Court expressly assumed the obligation to be a state debt, and the decision was grounded upon the specific authorization of the obligation

contained in section 16 of article 9 of our Constitution.

"So that the only cases decided by this court, wherein debentures issued without a vote of the people were in question, are not in point. In the case at bar the 'special fund' proposed to be pledged is neither derived from the thing sought to be pledged, nor is it an income from any property or thing belonging to the Capitol Addition Building Commission. It is, in effect, *a tax levied* on judicial proceedings (61 C. J. 72, § 5; and 61 C. J. 244, § 230) and more nearly like the 'special fund' pledged from the taxes of gasoline, etc., involved in the case of State v. Graham, supra.

"If such a 'special fund' as that involved in the case of State v. Graham, and which in our opinion is analogous to this, required special authorization by the people, proposed by the legislature of 1921, then we submit that special authorization would be required for the purpose of pledging taxes to be derived from judicial proceedings."

Respondent's position is well clarified by the foregoing quotation from his brief. As his counsel say, State v. Graham assumed, but merely for purposes of that decision, that the proposed highway debentures constituted "a borrowing of money by the state and a contracting of a debt by or on behalf of the state." That fact assumed, the adoption in 1921 of the amendment incorporated in the State Constitution as section 16 of article 9 was held to authorize the proposed debentures.

In State v. Regents certain building and improvement bonds issued under authority of Laws 1927, c. 47, to anticipate the income from institutional lands granted to the University of New Mexico by the enabling act and accepted and confirmed to it by section 12 of article 12 of the State Constitution for University purposes, were held not to be obligations of the state, notwithstanding the Constitution makes the state the owner of its state educational institutions. This court said: "This is simply a contract of the University to pay out of a designated fund when received. It is no more an obligation of the state than would be the obligation to pay the salaries of the University faculty. The mere fact that the University is the creature of the state and one of its instrumentalities to carry out its governmental functions is not controlling. The state has given the University certain property rights and has authorized it to make use of the same in a certain manner. This the University is proposing to do, and we can see no objection to the same."

In Seward v. Bowers we held that issuance of revenue bonds under authority of Laws 1933, c. 57, to anticipate the net revenues of a municipally owned water plant in the town of Springer, the proceeds of such bonds to be used "in the betterment, replacement, and improvement of

the present system," did not create a "debt" within the provisions of article 9, § 12, of the State Constitution requiring a referendum and tax levy. This, notwithstanding the fact that net revenue from the existing plant was included in the. pledge along with net revenue of the plant as enlarged and improved.

So that the distinction which respondent seeks to draw, as noted by comment on this. case in the quotation from his brief, supra, is not wholly apt. The income pledged did not arise wholly "from revenue to be furnished by the very thing to be purchased with the proceeds of the bonds." In appreciable part, it consisted of revenue rightfully allocable to physical properties already owned by the municipality.

Indeed, in his specially concurring opinion in that case, Mr. Chief Justice Watson indicated his view that the Legislature would not· have violated article 9, § 12, had it authorized a mortgage of the plant itself. He said: "Had the Legislature seen fit to authorize a mortgage of the plant, section 12 would not have been violated."

Speaking of the term "debt" as used in article 9, § 12, of the State Constitution, in Seward v. Bowers, we said: "The idea of a 'debt' in the constitutional sense is that an obligation has arisen out of contract, express or implied, which entitles the creditor unconditionally to receive from the debtor a sum of money, which the debtor is under a legal, equitable, or moral duty to pay without regard ·to any future contingency."

As applied to the constitutional provision interpreted in Seward v. Bowers, we disclosed our adherence to the "special fund" doctrine, and the general faith and credit of the municipality not having been pledged to retire the bonds, nor held subject to be invoked under "any future contingency" in aid of their retirement, sustained the proposed bond issue against the constitutional attack made upon it.

We reach the same conclusion in the case before us. While it is true that in Seward v. Bowers we were concerned with the intended meaning of the word "debt" as found in article 9, § 12, while here it is its meaning as employed in section 8 of the same article, we are convinced that the term is used in the same sense in each section, viz., as comprehending a debt pledging for its repayment the general faith and credit of the state or municipality, as the case may be, and contemplating the levy of a general property tax as the source of funds with which to retire the same.

This· conclusion is strongly reflected in the language itself of this and companion sections of article 9. Even without the aid of such strong intimation in the language employed, it is generally held under kindred provisions of other State Consti-

tutions, as we shall hereinafter show, that the debt whose contracting is inhibited is one which may engage the general taxing power of the state or municipality for its repayment. But under our Constitution we have something more.

Four sections of article 9 carry debt limitation provisions. Section 8 applies to the state and requires a tax levy and referendum. Section 10 relates to counties, section 11 to school districts, and section 12 to cities, towns, and villages. A tax levy and referendum are required under section 12, relating to cities, towns, and villages, and a referendum but no tax levy under section 10, relating to counties. As originally adopted, section 11, covering school districts, said nothing of a tax levy, but required a referendum. No property qualification was imposed upon the right to vote in the referendum to be held. Significantly, by Constitutional Amendment No. 2, submitted as Senate Joint Resolution No. 7 by the Eleventh Regular Session in 1933 (Laws 1933, p. 538), and subsequently adopted, ownership of real estate in the district was added as a qualification to the right to vote upon the question of creating the debt proposed.

Section 10, applying to counties, and section 12 to cities, towns, and villages, each imposes as a condition to the right to vote in the referendum enjoined, payment of a property tax in said county, city, town, or village, as the case may be, during the preceding year. The total indebtedness which can be created in any event (not contemplating the state's power under section 7), whether by the state under section 8, or by a county, city, town, or village under section 13, is limited to 1 and 4 per centum, respectively, of the assessed valuation of all property subject to taxation in the state, county, city, town, or village, as the case may be, *as shown by the last preceding general assessment.* As to school districts, section 11 places a debt limitation at 6 per cent., making the assessed value of taxable property within the district "as shown by the preceding general assessment," the measure of the amount, as in other cases.

With these obvious implications that the framers of the Constitution were writing and thinking of a debt repayable from the proceeds of a property tax levy against the general assessment rolls, it is easy to believe that the debt whose creation is thus prohibited, or whose amount is so limited, is one pledging the general faith and credit of the state or other subdivision, with a consequent right in the holders of such indebtedness to look to the general taxing power to satisfy the same.

Certainly, when the Constitution framers in section 8 limited the amount of any such debt as they had in mind to 1 per centum of the assessed valuation of all

property subject to taxation in the state, "as shown by the preceding general as-sessment," or when in sections 10 and 12 they enjoined payment of a property tax during the preceding year as a condition of the right to vote, they must have conceived that said assessment bore some relationship to the debt. Could the thought have been other than this, that such assessment roll and the property there listed would be resorted to from year to year by the general taxing power as the source of funds for repayment of the debt so created? We think not, but, if so, no explanation so naturally arises as the one suggested.

Yet if doubt could exist, it is resolved in favor of the conclusion we draw by the provision in section 8 "for an annual tax levy" sufficient to pay the interest and to provide a sinking fund to pay the principal of such debt within fifty years. Section 12 similarly provides for an irrepealable ordinance making a levy not exceeding 12 mills on the dollar *on all taxable property* within the city, town, or village to meet the interest and retire the principal within a like period.

In considering the question before us, we are not unmindful of a cardinal rule of construction applicable when dealing with State Constitutions, as distinguished from the Federal Constitution. "The constitution of the United States is a grant of power, and the various depart-ments of the federal government possess only those powers which are expressly or impliedly conferred on them by the constitution." 12 C. J. 743, § 157. But, "the constitutions of the several states, unlike the federal constitution, are not grants of power. On the contrary, they are limitations on the legislative powers of the states. * * * But however definitely the powers to be exercised under a state constitution may be pointed out, the legislative powers of the states are very general and very indefinite, notwithstanding; and the generally accepted doctrine is that they may pass any acts that are not expressly, or by necessary implication, inhibited by their own constitutions or by the federal constitution." 12 C. J. 745, § 167.

The debt limitation provisions of our State Constitution are just what the term implies, "limitations," and not "grants" of power. If the latter, it might with force and precedent be contended that a grant of power to create an indebtedness of a certain kind or in a certain manner was a denial of power to create a debt of any other kind or in any other manner. This under the doctrine of expressio unius est exclusio alterius. Cf. State v. Board of County Commissioners, 4 Neb. 537, 19 Am. Rep. 641. But in a recent opinion by Mr. Justice Bickley, Lujan v. Triangle Oil Co., 38 N. M. 543, 37 P.(2d) 797, 799, we repudiated a like contention challeng-

ing the power of the Legislature to impose excise taxes by reason of omission specifically to mention them in the amendment to article 8, § 2, adopted in 1914, as had been done in said section in its original form. We there said:

"We think, however, the flaw in counsel's argument is his assumption that the Legislature derived its power to levy and impose taxes from the constitutional provision he relies upon.

"While the language of section 2 of article 8 of the Constitution as originally written and adopted, heretofore quoted, is in form a grant of power to the Legislature, it must be regarded as either confirmatory of the power which necessarily inheres in the Legislature of a free state, or as a limitation upon power. * * *

"In Flynn, Welch & Yates v. State Tax Commission, 38 N. M. 131, 28 P.(2d) 889, 891, we quoted with approval from two pertinent decisions of this court, as follows:

" ' "The power of taxation is inherent in the state, and may generally be exercised through its Legislature without let or hindrance, except in so far as limited by the Constitution. * * *" Asplund v. Alarid, 29 N. M. 129, 219 P. 786, 789.

" ' "Given a reasonable classification of subjects, the power of the Legislature to lay an excise tax is almost unlimited. * * *" George E. Breece Lbr. Co. v. Mirabal, 34 N. M. 643, 287 P. 699, 701, 84 A. L. R. 827.'

"The proposition of appellant that the Legislature has no power to levy an excise tax is without merit."

That the enumeration of subjects of taxation contained in article 8, § 2, as originally adopted, was merely confirmatory of the Legislature's inherent power to tax, and not a limitation thereon, is rendered certain by the language of article 8, § 3, in its original form, in effect so declaring.

So, too, is the power of the Legislature plenary in the matter of incurring indebtedness, except as limited by the Constitution. 59 C. J. 213, § 350, under topic, "States." And no more in the one case than in the other may the courts convert into a grant that which concededly is a limitation, and thus deny to a co-ordinate branch of the government the exercise of a power not withheld from it by the framers of our fundamental law.

Now, either the debentures here assailed are to be condemned because not repayable from the proceeds of a property tax levy, or they are not within the interdiction of article 9, § 8, because not the kind of debt therein contemplated. One or the other conclusion seems inescapable. The framers of the Constitution were not unacquainted with excise taxation as a source of revenue, as witness the language

of article 8, § 2, as originally adopted. They thus either purposely denied to the state, through its Legislature, the power to employ same as a basis of credit to any extent whatsoever, and deliberately imposed the whole burden of repaying such indebtedness as lawfully might be created upon property taxpayers; or they left the Legislature in possession of its plenary powers touching the subject.

It is not unusual to find words employed in a Constitution in a less comprehensive sense than they are capable of bearing. "Taxes" is surely a term broad enough to cover excise as well as property taxes. And yet we have held in accordance with the courts of other states that the word "taxes," as used in the constitutional guaranty of equality and uniformity, does not apply to excise taxes. State v. Mirabal, 33 N. M. 553, 273 P. 928. Construing together these companion sections of article 9, in order to arrive at the true meaning and intent of the framers of the Constitution (Gutierrez v. Middle Rio Grande Conservancy District, 34 N. M. 346, 282 P. 1, 70 A. L. R. 1261), we hold the debt contemplated in section 8 thereof is one secured by a property tax, and not an excise tax.

■ And so we conclude that the debentures in question, neither requiring nor warranting a resort to the general taxing power of the state for their retirement, but payable instead from proceeds of an imposition in the nature of an excise laid upon all civil actions filed with the various district clerks of the state, in addition to the regular docket fee, to be converged into a special fund in the hands of the state treasurer, will not constitute a general obligation on the part of the state. Hence, they are not within the interdiction of article 9, § 8, of the State Constitution.

■ Counsel for respondent argue that the 1921 amendment of section 16 of article 9, involved in State v. Graham, constitutes a legislative interpretation, entitled to weight, that a constitutional amendment was necessary to authorize the debentures there assailed. Even so, such interpretation should have controlling persuasiveness only in the case of doubtful meaning or construction, a condition not here present. The submission by the Eleventh Regular Session of the Amendment to section 11 of article 9, adding the ownership of real estate within a school district as a condition to the right to vote upon the proposed creation of a debt by such district, might be urged with almost the same force as reflecting the view of that Legislature that the debt so to be created was to be repayable by a property tax affecting the owners of real estate.

Authorities are not wanting from other jurisdictions sustaining our conclusions. Moses v. Meier (Or.) 35 P.(2d) 981,

982; Ajax v. Gregory, 177 Wash. 465, 32 P.(2d) 560; Briggs v. Greenville County, 137 S. C. 288, 135 S. E. 153, 157; State v. Moorer, 152 S. C. 455, 150. S. E. 269; State v. Stevens, 173 S. C. 149, 175 S. E. 213; State v. Kansas State Highway Commission, 138 Kan. 913, 28 P.(2d) 770, 773; Alabama State Bridge Corporation v. Smith, 217 Ala. 311, 116 So. 695, 699. See, also, although not so directly in point because chiefly cases in which the revenue pledged arises out of the thing purchased or the improvement constructed, Baker v. Carter, 165 Okl. 116, 25 P.(2d) 747; State v. State Board of Education, 97 Mont. 121, 33 P.(2d) 516; California Toll Bridge Authority v. Kelly, 218 Cal. 7, 21 P.(2d) 425.

Moses v. Meier, supra, was an original mandamus action before the Supreme Court of Oregon to compel defendant officials to execute and issue certificates of indebtedness of the par value of $250,000 to meet the demands for unemployment relief, as provided by an act of the Oregon Legislature. The main question presented was whether the issuance and sale of said certificates under the authority of the act in question would violate a provision of the Oregon Constitution prohibiting the creation of any debt which, singly or in the aggregate with previous debts, should exceed the sum of $50,000, etc. The certificates were payable solely from revenues arising under the Liquor Control Act. The court held such certificates not "debts" within the meaning of said constitutional provision, among other things saying:

"From the above statutory provisions it is clear that these certificates of indebtedness drawn on a special fund and to be paid solely from anticipated revenue derived from the manufacture and sale of alcoholic beverages are not general obligations of the state. In the event the anticipated profits do not materialize and the fund becomes exhausted, the purchaser of such certificates has no legal redress against the state. He must look solely to the fund upon which they are drawn. Whether there would be a moral obligation to redeem such certificates of indebtedness is a matter with which this court is not concerned. Suffice it to say there is no legal obligation to do so in the event the special fund is exhausted. * * *

"In the event the net revenues turned in to the relief fund are insufficient to redeem the certificates of indebtedness, there will be no additional tax burden by reason thereof for, as previously stated, there is no general obligation on the part of the state to redeem them. A 'debt' within the meaning and purview of the constitutional provision in question is that which the state in any event is bound to pay. Alabama State Bridge Corporation v. Smith, 217 Ala. 311, 116 So. 695."

In Briggs v. Greenville County, supra, the county, a road district therein, and the supervisor of said county were about to enter into certain reimbursement agreements by which the county or road district, as the case might be, would agree to advance to the state highway commission moneys necessary for certain highway construction in Greenville county. The highway commission would reimburse the county, or district, for all moneys so advanced from funds set apart and authorized to be used for the construction of a state highway, said funds being federal aid moneys, automobile license tax, and three-fifths of the gasoline tax. Petitioner, a taxpayer of Greenville county, invoked the original jurisdiction of the Supreme Court of South Carolina to restrain the making of said agreements. One of the main questions presented was whethed said agreements constituted a state debt. The court held they did not, and said:

"Will said reimbursement agreements constitute a debt of the state incurred without a vote of the people, in violation of section 11 of article 10 of the Constitution of South Carolina?

"The proposed reimbursement agreements will not constitute a general liability of the state. The reimbursements to be made thereunder can be made only from a special fund consisting of the gasoline tax, automobile license tax, and federal aid.

No property tax can ever be levied to meet these obligations.

"Is such a limited liability a debt of the state in the constitutional sense? The underlying purpose of the constitutional provisions concerning the creation of state debt was that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subjected to taxation. This purpose will not be defeated if it should be held by this court that a debt for the construction of a state highway system, payable exclusively from federal aid moneys and special license taxes to be borne by the persons who will derive the principal benefits from the state highway system, is not a debt of the kind required by the Constitution to be approved by the voters of the state before it is incurred. According to the weight of authority in other states, such a debt does not fall within the terms of such a constitutional provision."

State v. Kansas State Highway Commission, supra, was an original proceeding in quo warranto before the Supreme Court of Kansas challenging the authority of the state highway commission to execute and carry out its part of the provisions of chapter 98 of the Laws of the Special Session of 1933, and for a declaratory judgment as to the validity of the act. The highway commission was about to enter into a contract with the proper agency of the fed-

eral government for borrowing the sum of $17,000,000 to be used for highway purposes. The plan involved the issuance of anticipatory warrants to secure such loan payable serially in not less than three nor more than thirty years. The opinion discloses that under certain constitutional provisions the state is given power to levy special taxes for road and highway purposes on motor vehicles and on motor fuels, and that most of the moneys used by the state through its highway department for road purposes is raised from that source. The warrants authorized by the act in question would be drawn upon this fund composed of special taxes theretofore levied. As to whether said warrants would constitute a debt within the meaning of provisions in the Kansas Constitution similar to those here involved, the court said: "Second. The debts referred to in article 11, §§ 5 and 6, supra, are debts to be paid by a general property tax. This is clear from the reading of the sections. What the framers of our Constitution were guarding against was the incurring of debts in excess of a million dollars payable by a general property tax without the question having been submitted to and adopted by the people. They regarded property as the basis of taxation. Wyandotte, Constitutional Convention, p. 334. They were not dealing with the question of obligations to be paid only by special tax, such as on motor vehicles or motor fuels, or from funds raised in some manner other than by general property tax."

The language of the Kansas Supreme Court is peculiarly applicable to our own constitutional provision. It is even more clear from a reading of the pertinent sections of article 9 in our Constitution that the debts therein referred to "are debts to be paid by a general property tax." The framers of our Constitution, as the Kansas court said of the framers of the Kansas Constitution, "regarded property as the basis of taxation."

In Alabama State Bridge Corporation v. Smith, supra, the bonds involved were secured by a pledge of the right to collect tolls until borrowed money should be repaid, as well as "the residue of the receipts from the gasoline tax collected by the state under the Excise Gas Tax Act" after certain enumerated deductions. There, as here, their validity was assailed upon the ground that a debt within the meaning of the constitutional prohibition was created. The Supreme Court of Alabama denied the contention in the following language, to wit: "Our judgment is that 'debt,' within the meaning, the purview, the whole content, of the constitutional provision, is that which the state in any event is bound to pay, an obligation secured by the general faith and credit of the state. Bonds that may be issued for the construction of bridges under this act will not evidence such an obligation—will not be so secured. The surplus of several funds pledged in the first place for the security of bonds, the proceeds of which have, or will have, been used for

other designated purposes or of funds devoted to other specified purposes—these surplus funds, along with the right to collect tolls, are pledged for the security of bonds to be negotiated for the building of bridges. If these special funds should for any reason fail of realization, or should be exhausted in execution of the primary purposes for which they may be raised, nothing will be left to creditors advancing money on the faith of the bonds authorized but the right to collect tolls. *There is no promise on the part of the state to pay in any event; there is no pledge that there will be a surplus of any fund; there is no pledge of the general credit of the state; there will be no debt within the meaning of section 213.*" (Italics ours.)

We are not unmindful that some courts take a view contrary to that which we uphold. See In re Senate Resolution, 94 Colo. 101, 31 P.(2d) 325 (a four to three decision); State v. State Highway Commission, 89 Mont. 205, 296 P. 1033. See, also, In re Opinion to the Govenor (R. I.) 169 A. 748, 89 A. L. R. 1521, and Crick v. Rash, 190 Ky. 820, 229 S. W. 63.

In none of these cases, however, were the courts construing constitutional provisions so obviously comprehending a debt repayable only by a resort to general property taxation. In one, at least, the Montana case, the decision does not turn upon a definition of the word "debt," but upon the broad comprehensive meaning of the term "liability," a word not found in section 8 of article 9 of our Constitution.

A careful reading of the act authorizing the debentures here questioned leaves no doubt that the same are payable solely and only from the proceeds of the special fund provided for in said act. The failure to provide an annual tax levy and order a referendum is suggestive, although not controlling, that in legislative contemplation the debentures have no claim upon a property tax levy for their retirement. But the imposition of the fee on civil actions, with a direction that the same shall be set up in a special fund for the express purpose of satisfying the principal and interest of these debentures, with the added mandate in section 12 of the act—that the issue and sale of said debentures shall constitute an irrevocable and irrepealable contract between the state and the owner of any of said debentures that the fees pledged for the payment thereof at the rate now provided by said law "shall not be reduced so long as any of said debentures remain outstanding and unpaid, and that the state will cause said taxes and/or fees to be promptly collected and set aside and applied to pay said debentures and interest according to the terms thereof"—abundantly repels the inference that any source of revenue whatsoever, other than that specially created in the act, might be resorted to by the holders of said debentures as security for the payment thereof.

The petition filed herein has attached a copy of the form of debenture and interest coupon proposed to be issued. It discloses a construction of the act conformably to the views herein expressed as to the special fee imposed being the sole security for the issue. It does not purport to be an obligation issued on the general faith and credit of the state, and cannot when issued be so considered.

It is urged by counsel for respondent that the use in said act of the phrase "taxes and/or fees" might suggest in the mind of an investor the right to look to general taxes as security. Obviously, the word "taxes" as used means the same thing as the word "fees." The language of the imposition is: "There is hereby levied a fee of $2.50," etc. That the word "taxes" as employed in the act can mean only the fee imposed by section 4 is rendered certain by the language of the second paragraph of section 13, reading: "The state treasurer shall keep separate accounts of all moneys collected under the taxes and/or fees hereby imposed," etc.

■ In the able dissenting opinion it is considered that the "taxes and/or fees" which the act imposes are a constitutionally sufficient provision for the retirement of these debentures, and concluded that popular ratification is all that is required to validate the statute and the debt. In so concluding, one word of the requirement is given little force. It is an an-

nual tax levy that is required. Certainly this additional charge upon litigants is not an *annual* tax; the imposition of it is not an *annual* tax levy.

If we were to accept the dissenting view of the meaning of "debt," we think we must hold this act an attempt to create a debt without provision for "an annual tax levy" and just as bad with as without popular approval.

But we attach some importance to the word "annual." It is not every casual source of revenue that may be allocated to the payment of a real "debt." It is some imposition annual in recurrence. That is the peculiar characteristic of the property tax as known to the framers of the Constitution and as still operating. Of course, excise taxes may be annual; some are, but the more important are not. The sales tax, the use tax, the severance tax, the succession tax, all have their real basis in transactions that occur once, give rise to a tax, and do not recur. We consider "annual" very significant, as pointing to a tax upon property which recurs periodically and is based upon ownership of wealth as a measure of ability to pay.

The original article 8 of the Constitution on "Taxation and Revenue" has been replaced. The original section 1 provided: "The rates of taxation shall be equal and uniform upon all subjects of taxation." This court, without hesitation, held this

provision applicable "only to taxes, in the proper sense of the word, levied with the object of raising revenue for general purposes, and not to such as are an extraordinary and exceptional kind," and that it was "to be restricted to taxes on property, as distinguished from such as are levied on occupations, business, or franchises, and as distinguished also from exactions imposed in the exercise of the police power rather than that of taxation." State v. Ingalls, 18 N. M. 211, 135 P. 1177, 1180.

Thus in 1913 this court had not come to look upon excises as ordinary sources of revenue to the state, and considered the word "taxation" unqualified, as meaning property taxes.

We cannot doubt that the court at the same time, and for stronger reasons, would have held that "an annual tax levy" meant a levy on property.

Convinced, as we are, that the debentures in question do not constitute a general obligation on the part of the state, the alternative writ heretofore issued will become peremptory.

It is so ordered.

HUDSPETH, WATSON, and ZINN, JJ., concur.

BICKLEY, Justice (dissenting).

Speaking of the term "debt" as used in article 9, § 12, of the State Constitution in Seward v. Bowers, 37 N. M. 385, 24 P. (2d) 253, we said: "The idea of a 'debt' in the constitutional sense is that an obligation has arisen out of contract, express or implied, which entitles the creditor unconditionally to receive from the debtor a sum of money, which the debtor is under a legal, equitable, or *moral duty to pay* without regard to any future contingency."

It has been said by some courts that it was not essential to the existence of debt that the creditor shall have any remedy at law or in equity for its enforcement. Mayor, etc., v. Gill, 31 Md. 375. In that case the court said: "A debt is money due upon a contract, without reference to the question of the remedy for its collection. It is not essential to the creation of a debt that the borrower should be liable to be sued therefor. No suit can be maintained against the State by one of its citizens, and yet debts are created by the State which it is bound in good faith to pay."

I understand that so far as the state is concerned, a pledge of its faith and credit has nothing more behind it than the "moral duty to pay."

In my opinion the framers of the Constitution intended to avoid the unseemly situation of the state ever at any time repudiating or failing to keep its obligations or promises. "To raise money on a pledge is to borrow it." Mayor v. Gill, supra. In the case at bar, it is proposed by the statute that the state shall induce

some one to furnish it with $175,000 for the purpose of defraying the expenses of the construction of a public building. The money is to be first borrowed, and then expended for a building for the executive, legislative, and judicial departments. I am unwilling to say that it is the intention of the Legislature that as a special fund is provided to repay the sums borrowed, however it may be derived, whether by an excise tax or a property tax, that if the special fund should prove insufficient to pay the debentures authorized and issued, that the state would be willing to continue to possess and occupy such building by its various departments whose functioning is based upon moral and ethical principles, without paying for it, and I do not believe that it was the intention of the Constitution-makers that the Legislature, even if so inclined, should ever be able to place the state in such an unmoral situation. The Constitution (article 9, § 8) declares: "No debt * * * shall be contracted by or on behalf of this state, unless * * *" (in this manner).

No language could be broader or more comprehensive. The only exception is found in the "preceding section" which permits the state to borrow money, not to exceed the sum of $200,000 in the aggregate to meet casual deficits or failure in revenue or for necessary expenses, and also in an unlimited amount to suppress insurrection and provide for the public defense. These exceptional powers are necessary to maintain the faith of the state and to secure its peace and good government; they are expressly excepted by the Constitution, and may be exercised within the discretion of the proper authorities. But with these exceptions, and perhaps another, the Constitution expressly forbids *any debt* occasioned by borrowing money being created by or on behalf of the state unless in the manner provided by section 8. I understand the majority to concede that what has been proposed will create a "debt," but it is not a "debt," prohibited by the Constitution. They say that section 8 of article 9 contains limitations upon power to create debts and does not contain a grant of power to create them. Conceding this to be so, section 8 does not give authority to create debts in the manner stated therein, but commands that *no debt* shall be contracted in any other manner than therein provided. This reflects the sound policy and wisdom of the provisions for the payment of the debt being made at the time of its incurrence, such provisions appearing both in section 29 of article 4 and section 8 of article 9 of our Constitution. It is manifest that the Constitution-makers thought it a wise policy to restrain the public officers from putting the name of the state to "negotiable paper" evidencing a promise of the state to pay money unless

at the time its promise to pay is authorized, a scheme or plan of taxation for the benefit of a fund to discharge the same is fixed, definite, and certain, and sufficient to pay the debt "at maturity." It has been suggested in conference that as there is no time limit upon the levy and collection of the excise taxes in question, there will be eventually collected enough taxes or fees upon lawsuits to pay the bonds. But the last of the bonds will mature in twenty-five years from the date of the issue. What if the "taxes and/or fees" collected over a period of twenty-five years are not sufficient to pay all of the debentures at maturity? It is not conceivable to me that it was not intended by the Legislature that these debentures would be paid at maturity. The Constitution manifests concern that state obligations shall be met "at maturity." It might well be that the tax would continue and the state treasury would be reimbursed for money the state used from other sources to pay its obligations. When we get outside of obligations issued and sold to raise money for local improvements in municipal corporations for the grading, paving, or general improvement of streets, the construction of sewers, the acquirement of public parks, waterworks, and other utilities of a similar nature, where the obligations or the ordinances authorizing them, in clear and unmistakable terms, limits recovery of the holder of the security to the revenues or funds set apart for the discharge and especially and distinctly waive any other recourse against the municipal corporation, I find the uniform rule to be that even though a special fund has been provided to pay the obligations, they are nevertheless general obligations of the public corporation. For reasons heretofore stated, this would be particularly true where the state is a contracting party. The law is well set forth in Abbott Public Securities, in sections 364, 365, and 366, citing decisions of the United States Supreme Court and other courts.

If the Legislature intended the debentures in question to be paid solely out of the special fund provided for in the act, that intention ought to have been expressed in precise terms and I find no such expression in the act. There are several indications to the contrary. That the statute manifests an intention of the Legislature to create a state debt is rather plain. It levies a tax for the purpose of making repayment. It provides that such taxes pledged for the payment of the debentures shall not be reduced so long as any of said debentures remain outstanding and unpaid, and contracts that the state will cause said taxes to be promptly collected and applied to pay said debentures. This constitutes a pledge of said taxes and was an endeavor to comply with the provisions of section 29 of article 4 and

section 8 of article 9 to make provision in the law authorizing the indebtedness for the levy of a tax sufficient to pay the interest and for the payment "at maturity" of the principal. Such debentures are to be signed by the chairman of a state agency, to wit, the Capitol Building Commission, and countersigned by the state treasurer and are payable at the office of the state treasurer. We have seen that there is high authority for the proposition that mere provision for payment out of a special fund is not enough to deprive securities of their character of general obligations.

We should assume that the Legislature was familiar with the principle that securities payable solely out of a special fund are not negotiable instruments. Discussing the essentials of negotiable paper, Abbott on Public Securities at § 214, says:

"Third, the fact of payment must be certain, that is, the instrument must be payable unconditionally and at all events. This essential eliminates under some of the authorities those securities payable only from a special fund and which never become under any conditions a charge upon the general revenues of the corporation or a general charge or obligation of the corporation issuing them, if the special fund or source of revenue which is the sole means of payment becomes insufficient and inadequate.

"A recent case in the United States Circuit Court of Appeals for the Eighth Circuit is illustrative of this line of authorities. Railroad aid bonds were issued by Washington County, Nebraska, which acknowledged an indebtedness in a certain sum and which contained the promise to pay the same to the payee or bearer from a special fund to be raised by the annual levy of a specified rate of tax on the taxable property of the county —such funds to be applied pro rata on such bonds: first, to the payment of the interest and then to the payment of the principal. The court held in its opinion by Judge Thayer: 'Yet we are of opinion that the obligations in suit are not negotiable bonds, within the rules of the law-merchant, and that a purchaser of the same for value in the open market cannot invoke for his protection the doctrine of estoppel by recitals, as it is generally applied upon actions upon negotiable municipal bonds. To render a written promise to pay money negotiable in the sense of the law-merchant, it is essential that it should be an unconditional promise to pay a certain sum of money at some future time, which must be "certainty as to the fact of the payment." If by the terms of the contract the sum promised to be paid, or a portion thereof, may never become payable, as where the sum promised is not to be paid unconditionally and at all events, but only out of a special fund de-

rived from certain sources, which may not prove adequate to meet the demand in full, the instrument, according to the great weight of authority, cannot be deemed negotiable, and entitled, in the hands of a third party, to the immunities which belong to that class of instruments. * * *' We have no reason to suppose and it has never been decided, that section 2968 of the Consolidated Statutes of Nebraska, which defines negotiable instruments, was designed to modify the doctrine aforesaid in any respect, or to declare that an instrument might be negotiable even though it was uncertain as to the fact of payment. The statute, like many other statutes of a similar character, was designed to place bonds and promissory notes on the same plane of negotiability as foreign bills of exchange, provided they possess the requisite words of negotiability and contain an unconditional promise to pay a certain sum of money at some future time, which is sure to arrive. Now, while the obligations in suit acknowledge an indebtedness is on the part of the county of Washington to a certain amount, yet the promise made to pay this indebtedness is not a promise to pay it unconditionally and at all events, but is a promise to pay it only out of a fund to be raised by a levy of one mill per dollar on the taxable property of the county, which fund is to be apportioned pro rata among all of the obligations, and applied first to the interest, and next to the indebtedness."

The Legislature must have known that this essential of negotiable paper was declared in our Negotiable Instruments Act (chapter 27, Comp. St. 1929 [section 27-101 et seq.]) wherein is stated the qualities of negotiable instruments. One of the essentials is that it "must contain an *unconditional promise* or order to pay a sum certain in money." (Italics mine.) Section 27-107.

In the face of this knowledge they said in section 9 of the statute in question (Laws 1934 Sp. Sess., c. 14): "Such debentures and the coupons thereto attached shall have all the qualities of negotiable paper under the law merchant." This is as much as to say: "Such debentures and the coupons thereto attached are payable unconditionally and at all events."

The fact that the statute creates a debt within the purview of section 8 of article 9 is the justification for attempting to make the law imposing the excise tax irrepealable. If it does not create a debt, the attempt to make this provision of the statute irrepealable is wholly ineffective and void because not within the power of the enacting Legislature. See State ex rel. Fletcher v. Executive Council, 207 Iowa, 923, 223 N. W. 737.

All of the foregoing proves to my mind that the Legislature intended to con-

tract both a moral and a legal obligation, in other words, a general obligation.

I thus conclude that there has been no violation of the Constitution and that the taking effect of the law merely awaits an approving vote of the electors.

This difference of opinion involves principles and consequences of far greater importance than the decision of the particular case before us and I deem it proper to further set forth my views.

A fair construction of the word "debt," as used in section 8 of article 9 of the Constitution, includes all liabilities arising out of contract that are or may become a legal obligation due from and to be met by the state from the proceeds of public taxes.

It is laid down in the prevailing opinion that the word "debt" as so used is limited to legal obligations of the state to be met by the state from the proceeds of property taxes. I am not satisfied of the soundness of this conclusion.

Whether it would be sound as to debts contracted by a city, town, or village, I express no opinion. The argument of the prevailing opinion would be stronger as applied to such debts because that section contemplates the payment of the debt out of a fund provided by "the levy of a tax, not exceeding twelve mills on the dollar upon all taxable property within such city, town or village." Const. art. 9, § 12.

That this language is broad enough to cover a levy of a tax upon personal property, I do not doubt. In construing a constitutional provision, it is our duty to give meaning to every word, phrase, clause, and sentence therein, if it is possible so to do. We should not import into the provisions providing for a state debt the restrictions and provisions surrounding the contracting of a debt by a city, town, or village, nor of a county or school district. The difference in policy manifested by the Constitution-makers, when dealing with state debts and debts of its corporate subdivisions, is apparent and it would be of little value at present to discuss the reasons therefor.

We are not dealing with the powers of cities, towns, or villages, which we must discover in grants of power or delegated power, among which is the power to levy property taxes and restricted power to levy excise taxes. We are dealing with the power of the state, much of which is inherent and unlimited.

It is conceded that the exactions of "taxes and/or fees" to pay the debentures in question are excise taxes.

It is assumed by all that the state has power to levy both property and excise taxes. Also, that its power to borrow money carries with it the power to repay it out of the proceeds of excise taxes as well as property taxes unless the power is limited by the Constitution.

We all agree that limitations upon these powers of the state must be discovered in plainly expressed terms.

The power to borrow the money in question and repay it out of the proceeds of excise taxes with the approval of the electors of the state is not challenged.

So far as material to a consideration of the present case, the limitations are three in number. First, section 29 of article 4 says: "No law authorizing indebtedness shall be enacted which does not provide for levying a tax sufficient to pay the interest, and for the payment at maturity of the principal."

This is a part of the article describing the powers of the Legislature. Section 8 of article 9 dealing with the debt contracting power of the state says the same thing except the command is that the law authorizing the debt shall provide "for an annual tax levy sufficient to pay the interest and to provide a sinking fund to pay the principal of such debt within fifty years from the time of the contracting thereof."

I do not understand that the majority think that the word "annual" would be·a barrier to the levying of an excise tax.

If the law authorizing the indebtedness levies a tax sufficient to pay the interest, and for the payment at maturity of the principal, and further provides that the issue and sale of the evidences of indebtedness shall constitute an irrevocable and irrepealable contract between the state of. New Mexico and the owner of any of said evidences of indebtedness that the tax pledged for the payment thereof at the rate levied in the act shall not be reduced for twenty-five years, I consider that the greater includes the less and that a levy of a tax for twenty-five years is a levy of a tax in each of the twenty-five years deemed annually sufficient to pay annual and other requirements of the debentures issued in accordance with the statute and is a substantial compliance with the requirement of section 8 of article 9.

It is not said in either of the two sections last quoted that the tax levied must be a "property tax" or a "direct tax" or an "ad valorem tax." I take it for granted those terms were well known to the framers of the Constitution, and if it had been their intention to limit the payment or securing of state debts to the proceeds of property taxes, they would have used some of these terms which are usually employed synonomously. The following definitions found in Ballentine's Law Dictionary will be helpful:

"Direct property tax. A tax levied at a uniform rate upon all the property real and personal within each city, town, or other taxing district, and which is usually intended to reach all property within the power of the state to tax. 26 R. C. L. 134."

"Direct tax. A capitation tax or a tax on real or personal property by reason of its ownership whether based on its value or not. 26 R. C. L. 37."

"Direct taxes. In 1894 it had come to be accepted that direct taxes in the constitutional sense were confined to taxes levied on real estate because of its ownership, but it was then held that the word 'direct' had a broader significance, since it embraced also taxes levied directly on personal property because of its ownership, and subsequently the 16th Amendment impliedly made this wider significance a part of the Constitution. 23 R. C. L. 948."

"Indirect tax. 'All taxes, other than polls, are either direct or indirect. A direct tax is one that is imposed directly on property according to its value. It is generally spoken of as a property tax, or an ad valorem tax. An indirect tax is a tax upon some right or privilege, and it is also called an excise or occupation tax.' See Foster & Creighton Co. v. Graham, 154 Tenn. 412, 285 S. W. 570, 47 A. L. R. 971, 975."

The rules of construction applicable to constitutional limitations do not permit us to limit the powers of the state beyond what such limitations plainly import. Section 5 of article 7 of the Constitution of Iowa is similar in several respects to section 8 of article 9 of our Constitution. I quote from the Iowa Constitution and italicize language which distinguishes it as follows: "And such law shall impose and provide for the collection of a *direct* annual tax, sufficient to pay the interest on such debt, as it falls due, and also to pay and discharge the principal of such debt, within twenty years from the time of the contracting thereof."

In 1929, the Supreme Court of Iowa had before it a case involving the procedure adopted for the incurring of a state debt which was to be repaid by a direct annual tax and also from a fund arising from gasoline and motor vehicle licenses. See State ex rel. Fletcher v. Executive Council, 207 Iowa, 923, 223 N. W. 737. The court held: "The general assembly has no power to *pledge* or to *substitute indirect* taxes for the *direct* tax required by the Constitution for the payment and discharge of a state bonded indebtedness approved by the people under Sec. 5, art. VII." (Italics mine.)

The court also held: "That part of the State Road Bond Act of 1928 which irrevocably pledged the primary road funds to the payment of the bonds was necessarily such a persuasive inducement to the approval of the act by the people as to invalidate the entire act, when it was adjudged that said pledge was invalid."

The court further held:

"The purport of the foregoing is to pledge irrevocably the fund arising from

gasoline taxes and motor vehicle licenses to the payment of the bonds. The plaintiff challenges the validity of these sections. The act as a whole is one for the creation of an indebtedness in excess of $250,000. The power of the Legislature to create it is circumscribed by the limitations of the Constitution. Within the limitations of the Constitution, and pursuant to its procedure, the 42d General Assembly had power to create the debt and to render its enactment thereof irrevocable by any future General Assembly. It had the constitutional power to impose a 'direct tax' for the payment of the debt it had created. No future General Assembly could repeal the levy of such tax while the debt remained. But this is so because the Constitution makes it so. In the absence of any constitutional provision to such effect, no General Assembly has power to render its enactment irrevocable and unrepealable by a future General Assembly. No General Assembly can guarantee the span of life of its legislation beyond the period of its biennium. The power and responsibility of legislation is always upon the existing General Assembly. One General Assembly may not lay its mandate upon a future one. Only the Constitution can do that. It speaks as an oracle and stands as a monitor over every General Assembly. The funds resulting from license fees and gasoline taxes are within the legislative power, and are necessarily subject to the control of the existing General Assembly. Its enactment in relation thereto will continue in force until repealed. The power of a subsequent General Assembly either to acquiesce or to repeal is always existent. It must be held, therefore, that sections 13 and 15 above quoted, were and are wholly ineffective and void. * * *

"The net result of section 12, like that of sections 13 and 15, is that it pledges the license and gasoline taxes to a primary liability for the payment of the debt. This is a purported substitution of these indirect taxes for the direct tax. Thereby the section becomes doubly invalid, because the Legislature had power neither to *pledge* nor to *substitute* an indirect tax for a direct one."

Under section 8 of article 9 and section 29 of article 4 of our Constitution, the Legislature not only *may* irrevocably pledge the proceeds of "taxes" for the payment of state debts, but is required to do so.

In State v. State Highway Commission, 89 Mont. 205, 296 P. 1033, 1037, the court had under consideration section 2 of article 13 of the Montana Constitution which provides that the Legislature shall not create any debt or liability except by law which shall provide for the levy of a tax sufficient to pay the interest and principal, within the time limited by law for the payment thereof.

The court held an act authorizing sale of debentures to be paid from excise tax on motor fuel to create a "liability" exceeding $100,000 and therefore required to be submitted to electorate. They also held that excise taxes on motor fuels are state funds, and the state may devote proceeds of such tax to any public purpose. Mr. Justice Angstman, concurring specially, said that he agreed with what was said in the opinion, but he thought the determination of the case would not require the drawing of distinctions between debts and liabilities, and that reasons stated in the court's opinion supporting the conclusion that the creation of the special fund for the payment of the debentures did not prevent the act from creating a liability were his reasons why the provisions for a special fund would not save the act from creating a debt. And further that:

"The scheme provided by chapter 1 diverts public revenues to the payment of a loan by the state as effectually as if the full faith and credit of the state were actually pledged in payment of the debentures. The fact that it creates a debt within the purview of section 2, article 13, is the justification for attempting to make the law imposing the excise tax irrepealable. Much was said by learned counsel for respondents in the brief and oral arguments to the effect that section 2, article 13, in the use of the words 'levy a tax,' means only an ad valorem tax. If this were so, then this act is in conflict with section 2, and a vote of the people would be useless. If that is the correct interpretation to be placed upon section 2, then that section, by construction, would contain this command to the Legislature: 'You shall not create a debt in any manner unless you provide for the levy of an ad valorem tax sufficient to pay the principal and interest within the time provided.' Confessedly no ad valorem tax has been levied. That construction of section 2 would make it read substantially as the Iowa Constitution (article 7, § 5), which requires 'the collection of a direct annual tax.' Under such a provision the Iowa Supreme Court has held that the Legislature was without authority to exercise a mortgaging power over future gasoline and motor vehicle license taxes. State ex rel. Fletcher v. Executive Council, 207 Iowa, 923, 223 N. W. 737.

"In my opinion, however, the words 'levy of a tax,' as used in section 2, contemplate only that the Legislature when creating a debt shall provide for raising sufficient revenues to pay the principal and interest by either of the constitutional methods of raising revenues for public purposes, and that it includes the levy or imposition of a license or excise tax, as here."

In my judgment the majority by construction make section 8 of article 9 read as does the Iowa Constitution and to con-

tain this command to the Legislature: "You shall not create a state debt unless you provide for the levy of a *property* or *ad valorem tax* sufficient to pay the principal and interest within the time provided."

In addition to the fact heretofore noted, that the framers of the Constitution did not say that in terms, there are good reasons to account for the absence of a command that would limit the resources for the payment of a state debt to the proceeds of a property tax. As the levy of excise taxes is one of the constitutional methods of raising revenues for public purposes, it seems unlikely that the framers of the Constitution would deprive the Legislature of the power to pledge the proceeds of such taxes for the payment of its debts. Mention has been made in the prevailing opinion that counsel for respondent argues that the 1921 amendment of article 9 by incorporating section 16 therein, involved in State v. Graham, 32 N. M. 485, 259 P. 623, constitutes a legislative interpretation, entitled to weight, that a constitutional amendment was necessary to authorize the debentures there assailed. I think such amendment is valuable as a legislative interpretation to the effect that *excise taxes,* as well as property taxes, were available to provide payment in the law authorizing indebtedness. Not being in doubt of that, the Legislature doubtless thought that a two-million dollar bond issue did exceed

"one per centum of the assessed valuation of all the property subject to taxation in the state," and therefore an amendment was necessary. And also, for expedition it was considered desirable to avoid the necessity of an approving vote by the electorate. Since the decision of this court in State v. Graham, supra, that amendment is to be considered as a permanent change of policy so that debentures anticipating an excise gasoline tax for the purpose of raising money to be covered into the state road fund may be accomplished without an approving vote of the electorate and even though the total indebtedness of the state may thereby temporarily exceed 1 per centum of the excise valuation of all property subject to taxation in the state. Mr. Justice Watson in that case said, arguendo: "This conclusion is strengthened by consideration of the fact that the method employed to effectuate the purpose was that of amending the Constitution. Unless permanency and future application were desired, the Constitution required no amendment. *A mere popular ratification of the particular act was all that was needed."*

The last sentence in the foregoing quotation is in accord with my thought that the Constitution would not require amendment in order to devote excise taxes to the payment of a state debt, otherwise valid.

The second limitation contained in section 8 of article 9 is that: "No such law

shall take effect until it shall have been submitted to the qualified electors of the state and have received a majority of all the votes cast thereon at a general election."

It is significant that in section 8 neither property owning nor tax paying requisites are added to what is elsewhere in the Constitution required in order to make an inhabitant a "qualified elector."

Having included among the qualifications of an elector under section 12 "as have paid a property tax therein during the preceding year," I see no reason for its *omission* from section 8 if proceeds of a property tax alone are to be resorted to to pay or secure a state debt. The fact that a limited class would bear the burden in the procedure involved in the case at bar is accidental so far as the principle involved is concerned. Constitutions speak in broad terms and it was doubtless understood that some excise taxes will touch the pocketbook of a vast majority of the "qualified electors of the state." The sales tax might be mentioned as an example.

The third limitation is: "No debt shall be so created if the total indebtedness of the state, exclusive of the debts of the territory, and the several counties thereof, assumed by the state, would thereby be made to exceed one per centum of the assessed valuation of all of the property subject to taxation in the state as shown by the pre-ceding general assessment." Const. art. 9, § 8.

The prevailing opinion referring to the provision last quoted says that no suggestion arises so naturally as that the assessment roll and the property therein listed could be solely resorted to from year to year by the general taxing power as the source of funds for repayment of the debt so created. In my judgment, the opinion here leans upon a very slender reed. It seems just as natural to me that since the Constitution-makers did not make the limitation upon aggregate indebtedness to depend upon amount of taxes paid, that they selected, arbitrarily perhaps, the only fixed and stable measure of the wealth of the state, namely, its property values, as shown by the assessment roll, and selected a percentage thereof as the limitation.

Furthermore, it seems to me that it would be about the only standard which could be selected. The limitation not being upon the amount of taxes paid, it would be impractical to use the elements which give rise to the imposition of the excise taxes as a measure or standard upon which to base a limitation. In other words, excise taxes usually are exactions for certain privileges which would be rather intangible as a basis for a limitation.

The opinion of the Supreme Court of Iowa in State ex rel. Fletcher v. Executive Council, supra, affords another suggestion

of value. They decided: "The general assembly has no power to render its enactment irrevocable and unrepealable by a future general assembly, even in an enactment which has been approved, under the Constitution, by a direct vote of the people. So held where the act sought to irrevocably pledge certain indirect taxes to the payment of state bonds."

This thought is elaborated in a quotation from the opinion heretofore employed herein.

Section 8 of article 9 of our Constitution authorizes the pledge of *taxes* to pay the interest and to provide a sinking fund to pay the principal of a state debt within fifty years from the time of the contracting thereof, and this authorized pledge may be irrevocable. If this is construed to mean "property taxes" alone, then I find no power vested in our Legislature to irrevocably *pledge* its excise taxes to the payment of a state debt.

I do not mean that available excise taxes may not be *used* for any public purpose, but I assert that if the majority is correct such excise taxes may not be *pledged* for a future period to the exclusion of later legislative control.

The general evil which the people intended to guard against was undoubtedly legislative improvidence. That evil, unchecked, would result disastrously to the state's credit, to its ability to carry on the ordinary and necessary functions of government from year to year, and in an increasing and finally intolerable burden of taxation on the people.

That evil and its resultants the people evidently thought there was reason to apprehend. Else the limitations in question would not have been included in the Constitution.

The result of the majority view is that *in addition to* the $200,000 to meet casual deficits, etc., and an unnamed amount to suppress insurrection and to provide for the public defense mentioned in section 7, the Legislature, pursuant to section 8, may pledge its property taxes to incur state debts with the approval of the electorate up to 1 per centum of the assessed value of all of the property subject to taxation in the state. And then the Legislature may, without restraint of a referendum and without limit, draw upon the state's other constitutional method of raising revenues for public purposes, viz., excise taxes, and pledge them for a hundred years or more in advance in order to borrow money in unlimited amounts to carry out some scheme, however plausible and worthy of one Legislature, and tie the hands of future Legislatures as to the particular excises so pledged. If this may be done, it is easy to see that future Legislatures must devise new sources of revenues to carry on the ordinary and necessary functions of government from year to year. Frittering

away the sources of public revenues and impoverishing the people by taxation are the same evils fundamentally, whether it be property or excise taxation that follows. If these evils may occur, then it seems that the framers of the Constitution guarded but poorly against the evils they intended to guard against.

Under the contention of the relator the Legislature having already pledged the "Road Fund," having proposed to set up the "Capitol Addition Building Fund," could also further divide the public revenue into another called the "School Fund," another the "Agricultural Fund," another the "Public Health Fund," another the "State Park Fund," and another the "State Fair Fund," and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness and without the approval of the electorate, provided each debt was made payable out of some one of the specially designated funds, into which all the revenue collected by excise taxation (and why not property taxation?) had been divided. The mere statement of the proposition carries with it, it seems to me, its

own refutation. If the process designed by the statute in question does not contract a debt, then the Legislature undoubtedly could do the same thing with other license or excise taxes, and thus accomplish by indirection what the Constitution prohibits to be done directly.

The people are gravely concerned as to how and the purposes for which their money is spent. They may eagerly desire to sell the proposed debentures to the end that suitable and adequate quarters and offices may be provided for the various executive, legislative, and judicial departments of the state. But another measure pledging excise taxes in large amounts for some special purpose might encounter their definite disapproval.

My conclusion is that the act of the Legislature here involved is all right, but it will not take effect until approved by the electorate.

I have reached my conclusion with a due sense of the great importance of the principles involved, and also after a faithful effort to sustain the law as the rules governing decisions in such cases require.

For the reasons stated, I dissent.